**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

MARCIA A. KEELING, ADMINISTRATOR OF THE
ESTATE OF DAVAGEAH K. JONES, Deceased,

      Plaintiff,

v.                                                        Case No.  2:19-cv-00225-AWA-DEM

CORRECT CARE SOLUTIONS, LLC, now            **JURY TRIAL DEMANDED**
conducting business as WELLPATH LLC,

      <u>Serve at</u>:

      Corporate Creations Network Inc.
      6802 Paragon Place #410
      Richmond, Virginia 23230

DALE MORENO, MD,

      <u>Serve at</u>:

      803 Carter Drive
      Emporia, VA  23847

KRASINDA S. BARTON, RN,

      <u>Serve at</u>:

      2608 Wood Creek Court, Apt. 301
      Suffolk, VA  23434

APRIL D. GREEN, HSA,

      <u>Serve at</u>:

      1312 Pershing Court
      Virginia Beach, VA  23453

SARAH DETERMAN, MENTAL HEALTH DIRECTOR,

      <u>Serve at</u>:

      3692 Labrador Lane
      Suffolk, VA  23434

AMIT R. SHAH, MD,

Serve at:

12201 Fairway Woods Court
Chester, VA  23836

LEROYAL T. PARKER, MENTAL HEALTH PROFESSIONAL,

Serve at:

3606 Hyde Circle
Norfolk, VA  23513

HAMPTON ROADS REGIONAL JAIL AUTHORITY,

Serve:

David A. Hackworth, Superintendent
Hampton Roads Regional Jail
2690 Elmhurst Lane
Portsmouth, VA  23701

DAVID A. HACKWORTH,

Serve at:

Hampton Roads Regional Jail
2690 Elmhurst Lane
Portsmouth, VA  23701

LINDA K. BRYANT,

Serve at:

917 Meadowhill Court
Chesapeake, VA  23320

FREY, JORDAN, and KITHCART (Hampton Roads Regional Jail
Correctional Officers assigned to watch the Decedent on the evening
of May 14, 2018 and the morning of May 15, 2018), and

Serve at:

Hampton Roads Regional Jail
2690 Elmhurst Lane
Portsmouth, VA  23701

2

JOSEPH P. BARON,

    <u>Serve at:</u>

    Norfolk Sheriff's Office
    811 E. City Hall Avenue
    Norfolk, VA 23510

        Defendants.

## **AMENDED COMPLAINT**

COMES NOW Plaintiff Marcia A. Keeling, Administrator of the Estate of Davageah K. Jones, Deceased, by Counsel, and moves this Court for judgment against the Defendants Correct Care Solutions, LLC, now conducting business as Wellpath LLC (referred to herein as "CCS"); Dale Moreno, MD; Krasinda S. Barton, RN; April D. Green, HSA; Sarah Determan, Mental Health Director; Amit R. Shah, MD; LeRoyal T. Parker, Mental Health Professional (the foregoing are collectively referred to hereinafter as the "CCS Defendants"); Hampton Roads Regional Jail Authority (the "Regional Jail Authority"); David A. Hackworth; Linda K. Bryant; Frey, Jordan, and Kithcart (Hampton Roads Regional Jail Correctional Officers assigned to watch the Decedent on the evening of May 14, 2018 and the morning of May 15, 2018); and Joseph P. Baron, and states as follows:

## I.    **INTRODUCTION**

1.    On May 15, 2018 at 4:53 a.m., 18-year-old Davageah K. Jones ("DJ") was pronounced dead by EMS, after being found unresponsive in his cell at Hampton Roads Regional Jail (the "Regional Jail").[1]  The Assistant Chief Medical Examiner determined the

---

[1] Referred to in certain documents referenced herein as "HRRJ."

cause of death to be "DIABETIC KETOACIDOSIS DUE TO TYPE 1 DIABETES

MELLITUS."  Diabetic ketoacidosis results from insufficiency of insulin.

2. In May 2018, the CCS Defendants in this matter failed to provide DJ urgently

needed medical care and access to that care.  As a Type 1 diabetic, DJ required twice-a-day

insulin injections *to stay alive*; Type 1 diabetics, who comprise only 5% of diabetics, are

*incapable of producing insulin*.  The CCS Defendants were fully aware that DJ, who also

suffered from schizophrenia and bipolar disorder, and had significantly decompensated while

detained at the Regional Jail, had not taken antipsychotic medication, nor received sufficient

insulin, *for more than two weeks*.  Previous times when DJ had not taken his medication,

medical providers, including CCS staff, had requested/obtained temporary detention orders

(TDOs), which had caused DJ to be transferred to mental health hospitals such as Eastern State

Hospital to become medication compliant. However, despite their awareness of DJ's mental and

physical decline, CCS staff failed to seek a TDO for DJ in May 2018.

3. On May 14, 2018, despite the foregoing circumstances, DJ was transported to

Norfolk General District Court by deputies of Joseph P. Baron, Norfolk City Sheriff.  The judge

suspended the hearing when it became obvious that DJ was acutely ill.  The judge directed DJ's

public defender to contact the Regional Jail staff and tell them that DJ required medical care.

The public defender immediately called her supervisor who, in turn, contacted the Regional

Jail's Assistant Superintendent and the Regional Jail's CCS Health Services Administrator and

told them of DJ's acute condition.  Records, however, reveal that neither provided any help to

DJ.  Records also do not indicate that Sheriff Baron's deputies/employees/ agents provided DJ

with access to/ provision of medical care either.  Instead, DJ was just returned to the Regional

Jail.  When DJ was returned to the Regional Jail, CCS staff ignored DJ's critical condition. DJ

4

was returned to his segregation cell.  Thereafter, at approximately 4:29 a.m. on May 15, DJ was found unresponsive.  He was supine on the floor, indicating that he had fallen.  Shortly after being found, DJ was declared dead by EMS.  A medical investigator found evidence that DJ had been vomiting in his cell.  DJ's vomiting, losing control of his faculties and falling, and lying on the floor unresponsive, were open and obvious signs that he needed help.  However, Regional Jail correctional officers, despite being required to perform inmate checks twice an hour, did not intervene.  Instead, it was not until a medical provider arrived for a routine diabetic check that DJ was found, and he was already unresponsive.

4.      The Defendants' indifference to DJ's acute medical needs caused DJ's death. Had the Defendants timely and properly intervened, DJ would not have died.

5.      Additionally, as detailed herein, DJ's death represents a pattern of deliberate indifference to the needs of inmates by the Regional Jail Authority, CCS, and their policymakers.

## II.   **JURISDICTION**

6.      Jurisdiction exists in this case pursuant to the Fourteenth Amendment of the U.S. Constitution, 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. §§ 1331, 1343.  Further, this Court has supplemental jurisdiction, pursuant to 28 U.S.C.§ 1367 (a), over the state law claims, including claims alleged pursuant to Virginia Code § 8.01-50 *et seq.* (wrongful-death statute), or, alternatively, pursuant to Virginia Code § 8.01-25 *et seq.* (survival statute).  All relief available under the foregoing statutes is sought herein by Plaintiff.

## III.  **VENUE**

7.      Venue is proper pursuant to 28 U.S.C. § 1391(b), because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this district.

8.      Assignment to the Norfolk Division of the Eastern District of Virginia is proper pursuant to Eastern District of Virginia Local Rules 3(B)(4) and 3(C), because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this division.

IV.    **PARTIES**

9.      Plaintiff MARCIA A. KEELING is the mother of the Decedent, Davageah Keshawn Jones.  The Plaintiff is, and was at all relevant times, a resident of the Commonwealth of Virginia.  On August 15, 2018, Plaintiff duly qualified as Administrator of the Estate of Davageah K. Jones, Deceased, in the Norfolk Circuit Court, under the applicable provisions of law.  A copy of the Certificate/Letter of Qualification is attached hereto, marked as **Exhibit A**. Plaintiff brings this action in her capacity as ADMINISTRATOR OF THE ESTATE OF DAVAGEAH K. JONES, DECEASED, pursuant to, among other statutes, Virginia Code § 8.01-50 *et seq.* (wrongful-death statute) and, alternatively, Virginia Code § 8.01-25 *et seq.* (survival statute).  All relief available under Virginia's wrongful-death and survival statutes is sought herein by Plaintiff.

10.     CORRECT CARE SOLUTIONS, LLC was a limited liability company organized under the laws of the State of Kansas with its principal office in Nashville, Tennessee, and with operations in Virginia, and, in particular, in the cities of Portsmouth and Norfolk.  Correct Care Solutions, LLC was co-owned by private equity firms Audax Group and Frazier Healthcare Partners.  At relevant times hereto, beginning in December 2015 and continuing through DJ's death in May 2018, Correct Care Solutions, LLC had a contract with the Regional Jail Authority. By contract, Correct Care Solutions, LLC assumed responsibility for the provision of on-site medical services to all inmates/detainees at the Regional Jail, including DJ, and also for

supervising, directing, and controlling health care personnel at the Regional Jail.[2]  Correct Care Solutions, LLC was paid in excess of $6.35 million per year to provide healthcare services at the Regional Jail.

a.      In or about September 2018, private equity firm HIG Capital LLC ("HIG"), purchased Correct Care Solutions, LLC and merged it with Correctional Medical Group Cos., a regional rival that HIG already owned.  The combined entity is named "Wellpath LLC."  According to Moody's Investor Service, Wellpath LLC is the largest correctional healthcare provider in the U.S.

b.      With regard to the provision of healthcare services at the Regional Jail, it appears that WELLPATH LLC is a mere continuation of Correct Care Solutions, LLC.  At or near the time that Correct Care Solutions, LLC ceased registration in Virginia, Wellpath LLC became registered in the Commonwealth, and claimed the same principal office and registered agent as had previously been identified in the Virginia State Corporation Commission ("SCC") business entity database for Correct Care Solutions, LLC.  As a practical matter and certainly from the perspective of the Regional Jail Authority and inmates/detainees at the Regional Jail, little, if anything, has changed since the merger other than that the name of Correct Care Solutions, LLC has changed to Wellpath LLC.  Indeed, clicking on Correct Care Solutions, LLC's website now automatically takes one to Wellpath LLC's website.  Correct Care Solutions, LLC, now conducting business as Wellpath LLC, is referred to herein as Defendant "CCS."

---

[2]  The Request for Proposals that Correct Care Solutions, LLC answered to become the Regional Jail's medical contractor (and that is referred to in the contract document itself) conveys that its primary objective was to provide "clinically necessary medical, dental, and psychiatric services to all inmates" in accordance with standards established by the Virginia Department of Corrections (VA DOC), the American Correctional Association (ACA), and the National Commission on Correctional Health Care (NCCHC).

c.     Defendant CCS and its employees/agents, at all relevant times, provided services to the Regional Jail and Norfolk City Jail as an independent contractor.  At all relevant times, Defendant CCS and its employees/agents acted under color of state law.

11.     Defendant DALE MORENO, MD, is a physician licensed in the Commonwealth of Virginia.  At all times relevant hereto, Defendant Moreno, MD, was a CCS employee and/or agent acting within the scope of his employment and/or agency, and under color of state law. In 2018, including at the time of DJ's incarceration and death at the Regional Jail, Defendant Moreno, MD, served as "Medical Director" of the Regional Jail.  Defendant Moreno, MD, had served in that capacity since at least June 2017.  As Medical Director at the Regional Jail, Defendant Moreno, MD, assumed responsibility for the provision of on-site medical services to all Regional Jail detainees/inmates, including DJ, and also for the supervision, direction, and control of health care personnel at the Regional Jail.  Additionally, upon information and belief, as Medical Director of the Regional Jail, Defendant Moreno, MD, was responsible for implementing medical protocols, as well as for the training, duties, and actions of the medical services staff at the Regional Jail.  According to a Medical Director Job Description posted at CCS's website during the relevant period, among other things, a CCS Medical Director, including Defendant Moreno:

- Practices in a real "Patient Centered Medical Home" where focus is on the patients instead of insurance or billing concerns.
- Provides required documentation of services to the Regional or Corporate Medical Director or designee in order to monitor services provided and compliance with facility/client contract.
- Reports to assigned facility at designated hour to examine referred patients.
- Provides emergency treatment on-site and responds appropriately in urgent or emergency situations.

- Supports standards of correctional medical care through adherence to existing policies and procedures for: admission to the infirmary, transfer to emergency room and utilization review process for specialty consultant referrals.

- Supervises care given by other professional or non-professional personnel providing instructions as needed.

- Reports any doubts or questions regarding the lack of appropriate referrals, nursing or medical intervention necessary for the realization of established patient goals to the Regional or Corporate Medical Director for disposition.

- Provides clinical oversight to the facility medical program, as defined by the NCCHC and ACA standards.

- Provides consultation for all professionals in the system.

- Provides medical services to inmates as scheduled.

- Partners with H.S.A. in supervising continuous quality improvement program, including patient grievances, sanitation, infection control, utilization management, pharmacy and therapeutics and assists in development of appropriate criteria.

- Serves as member of the Continuous Quality Improvement Committee. Make recommendations to improve patient outcomes.

- As needed – not less than annually – reviews and approves the treatment protocols, clinical policies and procedures, to include infection control and infirmary (if applicable at site) and the fire and disaster plans.

- Works with the Health Services Administrator to identify problems and to recommend solutions to improve patient outcomes.

- Assist the Health Services Administrator to establish and maintain Chronic Care Clinics that assure compliance with NCCHC and ACA standards, as well as CCS policy/procedures.

Defendant Moreno, MD, is sued in his individual and official capacities.

12.     Defendant KRASINDA S. BARTON, RN, was, at relevant times, a licensed Registered Nurse and Director of Nursing ("DON") at the Regional Jail.  As Director of Nursing beginning in or about January 2018 and continuing through DJ's death in May 2018, Defendant Barton was charged with having systems in place at the Regional Jail to provide for effective, proper nursing care and effective auditing of such.  According to a Director of Nursing Job Description posted at CCS's website during the relevant period, among other things, a CCS Director of Nursing, including Defendant Barton:

9

- Participates in planning, priority setting and the development of policies and procedures for health care activities that comply with facility and contractual requirements and ACA, NCCHC and State standards.
- Coordinates and monitors orientation, in-service training, and continuing education with the H.S.A.
- Coordinates the development, provision, and evaluation of patient care according to the standards of nursing practice in the state in which the facility is located.
- Prepares/submits reports as requested for Health Services Administrator (H.S.A.) in a timely manner.
- Conducts regular monthly meetings with nursing staff.
- Is a member of the Quality Improvement and Pharmacy and Therapeutic Committee and attends monthly meetings, assuring all QI screens and monthly reports are submitted timely.
- Ensures the practice of nursing is consistent with current standards and is responsible for level of care.
- Serves as representative for and/or liaison between nursing services and other health care providers as well as H.S.A. and coordinates patient care with other departments.
- Remains visible and is responsive to all medical disciplines.
- Supports and participates in evaluation designed to improve work conditions and patient care. Evaluates employees' performance and maintains accurate records for annual and provisional evaluations, as well as any others needed.
- Keeps abreast and follows through on incidents occurring on all shifts.
- Reviews all medication errors and forwards written findings to the H.S.A.
- Assesses established policies and procedures with re-review as needed
- Submits weekly and monthly reports of audits for Quality Improvement…

At all relevant times, Defendant Barton, RN, was an employee and/or agent of CCS acting within the scope of her employment and/or agency with Defendant CCS, and under color of state law. Defendant Barton, RN, is sued in her individual and official capacities.

13.     Defendant APRIL D. GREEN, HSA, was, at relevant times, a licensed clinical social worker and the Health Services Administrator at the Regional Jail.  As the Health Services Administrator beginning in December 2016 and continuing through DJ's death in May 2018, Defendant Green was charged with planning, directing, and coordinating medical and mental health services at the Regional Jail.  According to a "Health Services Administrator (Registered

10

Nurse)" Job Description posted at CCS's website during the relevant period, among other things,

a CCS HSA, including Green:

- is a professional administrator who manages and evaluates the Health Care Delivery Program in accordance with State and Local Regulations; ensures medical, dental, and mental health program activities are based upon goals, objectives, aims, and policies and procedures of CCS and the facility; and are compliant with ACA, NCCHC and State accreditation standards.
- Monitor[s] the implementation and effectiveness of procedures and programs.
- Evaluate[s] financial and statistical data, program needs and problems, and makes recommendations for improvements.
- Develop[s], utilize[s], revise[s], interpret[s], and ensure[s] compliance with CCS and facility policies and procedures.
- Maintain[s] communication and a good working relationship with facility administration, CCS employees, correctional personnel, contracted providers, and outside agencies.
- Oversee[s] recruitment, orientation, and performance evaluations of employees.
- Provide[s] regular staff meetings and ensure effective communication with all staff on all shifts.
- Assume [s] responsibility for planning, providing, and monitoring staff orientation and participation in education and staff development programs.
- Oversee[s] services rendered by contractors and professional staff.
- Ensure[s] reports are submitted as required in a timely and accurate manner.
- Audit[s] weekly logs and accounts payable forms, forwards them to the CCS home office as required.
- Review[s] status of inmates with serious health problems ensuring all necessary intervention and treatment is completed.
- Closely monitor[s] all potential catastrophic illnesses and explores utilizing all appropriate means of limiting both CCS and contractor's liabilities.
- Oversee[s] the utilization of special housing, infirmary beds, and outside inpatient and outpatient services for appropriateness and quality of services provided.
- Maintain[s] an awareness of overall concepts of managed care and make administrative judgments to ensure care provided is compatible with these concepts.
- Ensure[s], where available, NCCHC accreditation of the medical program by ensuring the presence of the required level or organizational efficiency and the provision of approved and appropriate medical services.
- Accept[s] on-call status.

- Promote[s] Quality Improvement standards by actively participating in the quality of care screen audits.

At all relevant times, Defendant Green, HSA, was an employee and/or agent of CCS acting within the scope of her employment and/or agency with Defendant CCS, and under color of state law.  Defendant Green, HSA, is sued in her individual and official capacities.

14.     Defendant SARAH DETERMAN, MENTAL HEALTH DIRECTOR ("MHD") is a licensed clinical psychologist and was the Mental Health Director at the Regional Jail in May 2018 and at all times previous since at least February 2017.  At all relevant times, Defendant Determan, MHD was an agent of CCS acting within the scope of her employment and/or agency with Defendant CCS, and under color of state law.  Defendant Determan, MHD is sued in her individual and official capacities.  According to an advertisement for the position, the Mental Health Director at the Regional Jail:

- Provides clinical and administrative oversight for the Mental Health program and the Mental Health staff within the facility as well as consultation regarding the mental health program.
- Provides clinical supervision and direction to Mental Health Professionals.
- Provides mental health services consistent with expectations of professional training and experience (e.g. Psychologist).

The Mental Health Director is required to have a doctorate in clinical or counseling psychology from an accredited college or university, and to be licensed to practice psychology in the State by the appropriate state licensing board, as well as current CPR certification.  The Mental Health Director is further required to have "experience in the coordination and administration of mental health service delivery systems."  She is also required to have had "significant coursework and professional experience in the mental health field that indicates knowledge of management and supervision techniques, peer review, quality assurance, group and individual psychotherapy,

12

diagnosis and treatment of psychological disorders, and psychological evaluation techniques."
The position is full time and the "Job Function" is "Health Care Provider."

15.     Defendant AMIT R. SHAH, MD, was, at all relevant times, a psychiatrist and
medical doctor licensed in the Commonwealth of Virginia and working at the Regional Jail.  At
all relevant times, Defendant Shah, MD was an employee and/or agent of CCS acting within the
scope of his employment and/or agency with Defendant CCS, and under color of state law.
Defendant Shah, MD, is sued in his individual capacity.

16.     Defendant LEROYAL T. PARKER, Mental Health Professional, was, at all
relevant times, licensed with the Commonwealth of Virginia as a Resident in Counseling and
working as a "Mental Health Professional" at the Regional Jail.  At all relevant times, Defendant
Parker, Mental Health Professional, was an employee and/or agent of CCS acting within the
scope of her employment and/or agency with Defendant CCS, and under color of state law.
Defendant Parker, Mental Health Professional is sued in her individual capacity.

17.     Defendants CCS; Moreno, MD; Barton, RN; Green, HSA; Determan, MHD;
Shah, MD; and Parker, Mental Health Professional, are collectively referred to herein as the
"CCS Defendants."  The CCS Defendants had specific responsibilities and duties to provide
medical and nursing care to Regional Jail inmates/detainees, including DJ.

18.     Records indicate that, in addition to certain named Defendants as described
herein, Jessica Langham, RN; Avagail Harrison, MA/LNA; Donna Boutte, RN; Kimberly
Harrell, RN; Robin Mizelle, MA/LNA;  Shelmara Johnson, MA/LNA; Terry Mikeska, RN; T.
Harris /Tamyra Harris, LPN; Shaneka Brown, RN; Sammy Best, MA/LNA; C. Ledford, RN, and
others were employed by CCS as nurses/medical professionals working at the Regional Jail in or
about May 2018.  Also, CCS employees were working at Norfolk City Jail on or about May 14,

13

2018, and, upon information and belief, would have been responsible for rendering care to DJ when his hearing was halted due to his emergent health issues.  At all relevant times, the foregoing nurses/medical professionals were employees and/or agents of CCS acting within the scope of their employment and/or agency with Defendant CCS.  Plaintiff's state-law claims against Defendant CCS include the actions/inactions of the foregoing employees, as well as the actions/inactions of the CCS Defendants and any other CCS employee who disregarded the medical needs of DJ.

19.     Defendant HAMPTON ROADS REGIONAL JAIL AUTHORITY (the "Regional Jail Authority") is a regional jail authority created by the cities of Chesapeake, Hampton, Portsmouth, Newport News and Norfolk, Virginia pursuant to Va. Code §§ 53.1-95.2 *et seq.* to manage the Regional Jail.  The Regional Jail serves the same cities that created the Regional Jail Authority.  The Regional Jail's website states, the "facility is operated under the direction of the Hampton Roads Regional Jail Authority which is comprised of the sheriffs, city managers and city council members representing their perspective [sic] jurisdictions."

a.     The Regional Jail Authority is not an arm or agency of the Commonwealth of Virginia, nor was it an arm or agency of the Commonwealth of Virginia at any relevant time hereto.  The Regional Jail's Policies and Procedures characterize the Regional Jail Authority as "an **autonomous** regional governmental organization." (Emphasis added.)

b.     The actual creation of the Regional Jail Authority required local activation by one or more municipalities.

c.     The Regional Jail Authority is not a political subdivision of the Commonwealth of Virginia, nor was it a political subdivision of the Commonwealth of Virginia at any relevant time hereto.

14

d.    The Regional Jail Authority is not a municipal corporation, nor was it a municipal corporation at any relevant time hereto.

e.    Presently, and at all relevant times hereto, the Regional Jail Authority lacked the power of eminent domain.

f.    Presently, and at all relevant times hereto, the Regional Jail Authority was authorized and empowered to sue and be sued in its own name, plead and be impleaded, by virtue of Va. Code § 53.1-95.7.

g.    Va. Code § 53.1-95.7 (3) vests in the Regional Jail Authority the power "[t]o appoint, select, and employ officers, agents, and employees therefor, … and to fix their respective compensations[.]" Accordingly, the Regional Jail Authority was the employer of Defendants Hackworth, Bryant, Frey, Jordan, and Kithcart.

20.    Defendant DAVID A. HACKWORTH was the Interim Superintendent of the Regional Jail in May 2018. Prior to being appointed Interim Superintendent in March 2018 following the resignation of the previous superintendent, Hackworth was the Chief Deputy of the Sheriff's Office in Chesapeake, a Regional Jail Authority member city. Hackworth was subsequently named the Superintendent of the Regional Jail after DJ's death, and remains the Superintendent to date.

a.    At relevant times, Defendant Hackworth operated and managed the Regional Jail and directed and supervised its personnel. In addition, at relevant times hereto, Defendant Hackworth was an employee, agent, and/or servant of Defendant Regional Jail Authority, and was acting within the course and scope of his employment and/or agency with Defendant Regional Jail Authority, and under color of state law. Defendant Hackworth is sued in his individual and official capacities.

b. According to the Policies and Procedures of the Regional Jail, Defendant

Hackworth "[p]erforms the duties of chief executive officer" of the Regional Jail Authority. The

Policies and Procedures further provide that the Regional Jail's Superintendent "[p]lans, directs,

coordinates, and manages all activities of the [the Regional Jail]. Ensures effective management

and operation of the facility. … Ensures training, supervision, and performance evaluation of

staff are provided…. Administers the custody, care, and discipline of the inmate population….

Manages the inmate population to ensure compliance with institutional policies and procedures,

mandatory State standards, and relevant State and Federal law."

c. Upon information and belief, at relevant times, the Regional Jail Authority

established minimum standards for the administration and operation of the Regional Jail and

delegated certain policy and management decisions concerning the Regional Jail to the Interim

Superintendent, Defendant Hackworth.

21. At relevant times, Defendant LINDA K. BRYANT was the Assistant

Superintendent of the Regional Jail. At relevant times hereto, Defendant Bryant was an

employee, agent, and/or servant of Defendant Regional Jail Authority, and was acting within the

course and scope of her employment and/or agency with Defendant Regional Jail Authority, and

under color of state law. Defendant Bryant replaced Eugene Taylor, III, as Assistant

Superintendent on October 7, 2016. Defendant Bryant retired from the Regional Jail effective on

or about May 31, 2018 – approximately two weeks after DJ's death. Ms. Bryant assumed a state

position nine days after retiring from the Regional Jail.

a. Along with Defendant Hackworth, Defendant Bryant, at relevant times,

operated and managed the Regional Jail and directed and supervised its personnel. The Policies

and Procedures of the Regional Jail state that the Assistant Superintendent "support[s] the

Superintendent in planning, directing, and coordinating the overall operations of [the Regional Jail]."

      b.    Like Defendant Hackworth, Defendant Bryant was tasked with "Ensur[ing] effective management and operation of the facility. … Ensures training, supervision, and performance evaluation of staff are provided."

      c.    Defendant Bryant is sued in her individual capacity.

22.    Defendants Regional Jail Authority, Hackworth, and Bryant are collectively referred to herein as the "Jail Authority Defendants."

23.    Defendants FREY, JORDAN and KITHCART were, at all relevant times hereto, correctional officers at the Regional Jail, and were acting within the course and scope of their employment and/or agency with the Regional Jail Authority, and under color of state law. Specifically, Frey was a Sergeant and Jordan and Kithcart were regular Correctional Officers in the Regional Jail's hierarchy of positions. The three are collectively referred to herein as the "Correctional Officer Defendants."  All worked in the area where DJ was confined at the Regional Jail, at least on the evening of May 14, 2018 and morning of May 15, 2018, and were responsible for maintaining the custody and care of DJ, and other Regional Jail detainees and inmates.  Frey also had supervisory duties as described herein. The Correctional Officer Defendants are sued in their individual capacities.  The applicable Policies and Procedures of the Regional Jail provide, among other things, that:

      a.    "Jail Officers," including Defendants Jordan and Kithcart, "supervis[e] inmates in all activities of jail routine … Monitor[] and observe[] inmate behavior… [M]ake[s] regular rounds of areas accessible to inmates to observe activities.  Conduct[] security checks…Observe[] inmates' behavior to ensure an orderly and safe environment … Report[] all

17

incidents or problems to the Watch Commander or other supervisors…Perform[] duties under the direct supervision of an assigned Sergeant …, who provides guidance and direction…"

      b.    Sergeants, including Defendant Frey, "[s]upervise[] the work of Jail Officers … Supervise[] the monitoring of daily activities of inmates by Jail Officers… Observes inmates' behavior to ensure an orderly and safe environment…Handle[] inmate problems and complaints or refer[] to appropriate party… Directs and helps conduct security checks of assigned areas..."

      24.    At all relevant times, Defendant JOSEPH P. BARON was (and currently is) the duly elected Sheriff of the City of Norfolk, Virginia.  As such, he was responsible for the care and custody of detainees and inmates committed to his custody, including when transported to, and held at, Norfolk courts.  Defendant Baron was a constitutional officer independent of the City of Norfolk.  He was the commanding officer of all deputies, officers and employees under his command.  He was responsible for the training, supervision, and conduct of all deputies, officers, and employees under his command, and for promulgating policies and customs regarding the training and supervision of such deputies, officers, and employees.  He was responsible by law for those in his custody, for enforcing the regulations of the Norfolk Sheriff's Office, and for ensuring that personnel under his command obey the laws of the Commonwealth of Virginia and the United States.  Defendant Baron was vested with the responsibility and authority to hire, fire, train, and supervise, to set and enforce policies and procedures, and to provide protection and access to medical care for those committed to his custody, including DJ. At all relevant times, Defendant Baron and his deputies, employees, and agents were acting within the course and scope of their employment and under color of state law.  Defendant Baron is sued in his individual and official capacities.

V.    **APPLICABLE STATUTES AND CASE LAW**

25.    Virginia law requires prisons to provide mental health services to inmates. Va. Code § 53.1-32(A) ("It shall be the general purpose of the state correctional facilities to provide . . . medical and mental health care and treatment . . . .").

26.    Among other statutory requirements, the Defendants employed at the Regional Jail, as well as Defendant Baron and his deputies and employees, were required to comply with Virginia Code § 53.1-126, which states that, with regard to detainees/inmates, "…medical treatment shall not be withheld for any … serious medical needs, or life threatening conditions."

27.    Virginia Code § 19.2-169.6, *Inpatient psychiatric hospital admission from local correctional facility,* promulgates a process for the issuance of a temporary detention order (TDO).

VI.    **FACTS**

A.    **DJ died from diabetic ketoacidosis, which is caused by an insufficiency of insulin**

28.    On May 15, 2018, at 4:53 a.m., DJ was pronounced dead by EMS, after being found unresponsive in his cell at the Regional Jail.

29.    The Assistant Chief Medical Examiner determined the cause of death to be ""DIABETIC KETOACIDOSIS DUE TO TYPE 1 DIABETES MELLITUS."

30.    Diabetic ketoacidosis ("DKA") results from insufficiency of insulin.  In response, the body switches to burning fatty acids (rather than insulin), which produces acidic ketone bodies.  DKA is typically diagnosed when testing finds high blood sugar, low blood pH, and ketoacids in either the blood or urine. The primary treatment of DKA is with intravenous fluids and insulin.  The survival rate with adequate and timely treatment is approximately 96 to 99%.

19

**B.**   **DJ was diagnosed with Type 1 diabetes at about age 9**

31.   In approximately 2009, at about the age of 9 years old, DJ was diagnosed with

Type 1 diabetes.  Type 2[3] diabetes is the most common form of diabetes; only approximately 5%

of diabetics have Type 1 diabetes.  In Type 1 diabetes, the body ***does not produce insulin***.  The

body breaks down carbohydrates into blood glucose (also called blood sugar), which it uses for

energy.  Insulin is a hormone the body needs to transport glucose from the bloodstream into the

cells of the body.[4]  The body then uses the glucose along with oxygen to create energy. Without

glucose, the cells cannot make energy and ***the body starts feeding off itself***.

**C.**   **DJ was also diagnosed with schizophrenia and bipolar disorder, conditions
which impeded his compliance with prescribed medications**

32.   Sometime after 2009, DJ was diagnosed with schizophrenia and bipolar disorder.

These two mental disorders played a significant role in DJ's management/non-management of

his Type 1 diabetes. When DJ was in a mental state such that compliance with his psychotropic

medication was possible, he also took his diabetes medication.  However, when DJ was not in a

mental state supportive of psychotropic medication compliance, including when his psychotic

symptoms became more pronounced, his ability to comply with diabetes medications

significantly declined.  This harrowing cycle – compromised mental health contributing to and

exacerbating the effects of non-compliance with prescribed antipsychotic medications, which, in

turn, resulted in non-compliance with diabetes medications while he was mentally compromised

---

[3]  In Type 2 diabetes, the body does not use insulin properly.  At first, the pancreas makes
extra insulin to make up for it. But, over time, it is not able to keep up and cannot make enough
insulin to keep blood glucose at normal levels.  In contrast, once a person has Type 1 diabetes,
the pancreas can never make insulin again. To fix this problem, someone who has Type 1
diabetes needs to take insulin through regular shots or an insulin pump.

[4]  When a person has Type 1 diabetes, the body still can get glucose from food, but the
lack of insulin means that glucose cannot get into the cells where it is needed. So, the glucose
stays in the blood. This makes the blood sugar level very high and causes health problems.

– caused DJ to be hospitalized on multiple occasions for, among other conditions, insulin insufficiency.  However, these instances were promptly corrected with treatment, including, when necessary, involuntary commitment, and did not cause any lasting effects/harm.  In contrast, DJ's serious medical needs would be rebuffed during his final medical episode in May 2018, causing his death.

**D.      DJ's "active" hallucinations impeded his ability to attend school; he was well behind his peers in school**

33.     On October 6, 2015, Jeninne McNeill, Ph.D, LCP, a licensed clinical psychologist who had met with DJ in therapy sessions, observed that DJ's Schizophrenia diagnosis required that he be placed in a day treatment facility that is designed to deal with mental health difficulties such as his. Dr. McNeill further remarked, "[i]t is imprudent to keep Davageah in a traditional classroom setting, due to his extremely disorganized behavior, lack of concentration and impulsivity."  She observed, "Davageah has active hallucinations that cause him to respond in an aggressive and threatening manner. As a result, he will continue to be extraordinarily disruptive in the classroom and will continuously require one-on-one intervention."  Dr. McNeill repeated the same points in a February 22, 2016 letter.

34.     DJ's mental health challenges caused him to fall well behind his peers in school. In November 2017, when DJ turned 18 years old, he was attending Northside Middle School, where he was only in the 7th grade.  He was five years behind students of his same age.

35.     In November 2015, DJ was admitted to Commonwealth Center for Children & Adolescents ("CCCA"), a Virginia Department of Behavioral Health and Developmental Services mental health hospital for children. He was admitted through the Norfolk Community Services Board.  DJ remained hospitalized at this facility until December 22, 2015.  His discharge medications included Aripiprazole for "psychosis," and Divalproex Sodium ER for

"mood swings" as well as two different types of insulin.  Discharge diagnoses included, among other things, Schizophrenia and Insulin Dependent Diabetes Mellitus.

      E.     <u>In 2016 and 2017, DJ struggled with medication compliance</u>

36.    From March 30 through May 3, 2016, DJ was hospitalized at CCCA.  He was admitted through the services of the Norfolk Community Services Board.  His discharge diagnoses included, among other things, Schizophrenia, Acute Exacerbation, Insulin Dependent Diabetes Mellitus, and asthma, by history.  Discharge medications included, among others, the antipsychotic Aripiprazole, as well as different doses of Novolog insulin.

37.    On or about July 29, 2016, DJ presented to DePaul Medical Center, Norfolk, and, thereafter, upon transfer, to Children's Hospital of the King's Daughters, Norfolk, "in DKA" (diabetic ketoacidosis).  He reportedly experienced abdominal pain, slurred speech, increased work of breathing, polyuria and polydipsia prior to arriving at DePaul.  He was discharged stable and no longer in DKA from Children's Hospital on July 30, 2016.  His hospital course included treatment with an insulin drip, normal saline and potassium-acetate, followed by a transition to subcutaneous insulin after his condition improved.

38.    In late September 2016 through October 6, 2016, DJ was hospitalized at Children's Hospital of King's Daughters, in Norfolk, Virginia for "DKA" (Diabetic ketoacidosis).  His records note, in addition to DKA, discharge diagnoses of Diabetes Mellitus-Type 1, uncontrolled, Dehydration and Acute kidney injury.  His discharge summary detailed that his admission labs "revealed severe acidosis, hypernatremia and acute kidney injury."  DJ was treated with fluids and IV insulin on admission and his blood sugars and electrolytes were monitored throughout his hospitalization.  He transitioned to subcutaneous insulin, but required continued IV fluids through discharge, at which point he was brought back to stable condition.

39.     From May 20, 2017 to June 25, 2017, DJ was again hospitalized at CCCA.  His discharge diagnoses included Schizophrenia, Acute Exacerbation, Insulin-dependent Diabetes Mellitus, and Status post episode of Diabetic Ketoacidosis, reflecting again the vicious cycle of his mental health affecting his physical health.

40.     The Discharge form from DJ's May-June 2017 hospitalization also indicates that outside medical assistance was required to assist DJ with medication compliance. Stated another way, *DJ was unable to stay on his medications by his own efforts; others needed to intervene on his behalf*.  The Discharge form noted that DJ "will continue services with outpatient treatment services from Integrated Health Services with case manager Robert Alexander… and medication management with Jennifer Cook…"  His primary care providers at Children's Hospital of the King's Daughters were also listed.

41.     On December 30, 2017, a Temporary Detention Order ("TDO") for DJ was signed by a Norfolk Magistrate.  The TDO was ordered after DJ allegedly threw a rock at a car causing damage; a convenience store worker who also owned the car had reportedly told DJ to leave the store prior to the alleged incident. A police report was subsequently filed. DJ was arrested on December 23, 2017 and released pending a court hearing scheduled for January 24, 2018.  Another hearing was thereafter scheduled for January 31, 2018.

42.     The December 30, 2017 TDO was issued pursuant to Virginia Code Section 37.2-809 following an evaluation by the Norfolk Community Services Board.  Pursuant to Code Section 37.2-809, the TDO stated in pertinent part that:

> it appearing from all evidence readily available, ... that the person (i) has a mental illness, and that there exists a substantial likelihood that, as a result of mental illness, the respondent will, in the near future, (a) cause serious physical harm to him/herself or others ... or (b) suffer serious harm due to his/her lack of capacity to protect him/herself from harm or to provide for his/her basic human needs, (ii) is in need of hospitalization or

treatment, and (iii) is unwilling to volunteer or incapable of volunteering for hospitalization or treatment.

As a result of the TDO, DJ was admitted to Riverside Behavioral Health Center Adult Unit on December 30, 2017. He would continue to be hospitalized at Riverside until discharge on January 12, 2018. A commitment hearing was held on January 2, 2018 in Hampton General District Court, which resulted in further involuntary commitment through January 12, 2018. While at Riverside, DJ was prescribed Haloperidol and Haloperidol Decanoate for "Psychosis." He was also prescribed Insulin Glargine, Insulin Lispro, and Insulin NPH-Insulin for "Insulin-Dependent Diabetes." At discharge, an appointment was set up for DJ for medication management through Norfolk Community Service Board on February 8, 2018. It was noted that he had had a "mental health problem" and "elevated blood sugar level" at the time of hospitalization.

43.     Thereafter, on January 28, 2018, a criminal complaint was again filed against DJ by the convenience store worker from the December 2017 incident. The worker alleged that DJ was loitering in the store parking lot, and, when told to leave, threatened the worker.

44.     On January 29, 2018, DJ was hospitalized at DePaul Medical Center in Norfolk for a medical "EMERGENCY." He was diagnosed with diabetic ketoacidosis. This was not his first diagnosis of diabetic ketoacidosis; as noted above, he had received the diagnosis of diabetic ketoacidosis numerous times previously, but each time he received adequate medical care and did not suffer lasting damage. After being stabilized, DJ was discharged from DePaul Medical Center on January 31, 2018. Later that night, January 31, 2018, DJ was served with a Summons requiring him to appear in Norfolk General District Court on March 28, 2018 to answer to charges brought in connection with the January 28, 2018 incident with the convenience store employee.

45.     Also on January 31, 2018, DJ was charged with a failure to appear on his

misdemeanor charge from December 2017.  He was subsequently arrested on February 3, 2018.

**F.     Since February 2018, Norfolk City Jail personnel were aware of DJ's Type 1 diabetes, schizophrenia, and bipolar disorder**

46.     After being arrested on February 3, 2018, DJ was taken into custody that same

day by the Norfolk City Sheriff, Defendant Baron, at the Norfolk City Jail.  The medical care

contractor at Norfolk City Jail was CCS.  In his Receiving Screening of the same day (February

3, 2018), it is noted that DJ has Type 1 Diabetes Mellitus and a psychiatric history, including

monthly Haldol (Haloperidol) injections.  The Norfolk Community Services Board then called

the Norfolk Jail on February 8, 2018 and informed a CCS mental health provider that DJ had

schizophrenia.  A CCS mental health provider, Zachary Stroud, indicated that he was unable to

evaluate DJ on February 9, 2018 because DJ "was lying on his bed with no mattress with a

blanket over his head" and "refused to get up to speak with me."

47.     On February 13, 2018, DJ was sent out of Norfolk City Jail to Sentara Norfolk

General Hospital ER via ambulance.  His blood sugar was twice listed that day in "Vitals"

records at the Jail as "HIGH."  Norfolk City Jail records indicate that his blood sugar was

intensely high for a considerable period prior to February 13, 2018; in addition to high levels

dating from the beginning of his detainment on February 3, 2018, from February 10, 2018

through February 13, 2018, his blood sugar was recorded at 413, 591, "HIGH," 500, 207, 111,

540, 463, 463 (again), 357, "HIGH" and "HIGH."  A jail nurse wrote on February 13 that DJ

was vomiting and soiling himself, was not eating or drinking, was pale, and his eyes were rolling

back.  She noted that her meter registered "HIGH" when she took his blood sugar. A doctor was

contacted who gave an order to send DJ out to the ER.  An "Inmate Medical Referral"

concerning DJ's referral to an outside hospital describes the severity of his illness as "SERIOUS EMERGENCY."

48.     DJ was hospitalized at Sentara until February 20, 2018.  His primary discharge diagnosis was diabetic ketoacidosis (DKA).

        a.      It was noted in his hospital course summary that DJ had been first admitted to the ICU for his diabetic ketoacidosis and put on an insulin drip.  He then transitioned to subcutaneous lantus and premeal insulin.  His Hemoglobin A1C level was found to be very high at 11.[5]  His insulin and diet were adjusted and an endocrinologist was consulted as to the best insulin plan.  DJ was also started on Seroquel due to his history of mental illness and "outburst" at the hospital.

        b.      DJ's "After Visit Summary," "Universal Transfer Summary," "MD Progress Notes-last 3 Days," "MD D/C [Discharge] Summary," "Discharge Orders," "Discharge Med Rec," and "History & Physical" regarding his hospital stay at Sentara were obtained by CCS and among documents produced pre-litigation by the Regional Jail.

        **G.      DJ was moved to the Regional Jail on February 21, 2018; DJ's "Chronic" "Endocrine" "Problem" was noted by CCS personnel**

49.     On February 21, 2018, DJ was moved from the Norfolk City Jail to the Regional Jail.  The move followed a phone discussion between Norfolk City Jail and Regional Jail personnel who decided that the Regional Jail was better equipped to handle DJ's mental illness,

---

        [5]  The Hemoglobin A1C test is used to measure average blood sugar level for the past two to three months. *See* Mayo clinic website https://www.mayoclinic.org/tests-procedures/a1c-test/about/pac-20384643]. For a person with diabetes, an A1C level above 8 percent means that the diabetes is not well-controlled and there is a higher risk of developing complications of diabetes. *Id.*

including schizophrenia and bipolar disorder.  Indeed, the Regional Jail was intended to serve, and holds itself out to the communities that it serves, as the appropriate location for inmates/detainees who suffered from health and mental health conditions.  *See* the Regional Jail's website, https://hrrj.org/about/ (stating, "The Regional Jail houses the majority of the inmates from the five jurisdictions with severe medical and mental health needs and essentially serves as the medical and mental health correctional facility for the member cities.").

50.     On the day of the transfer (February 21, 2018), Defendant Sarah Determan, a CCS[6] psychologist who served as the Regional Jail's Mental Health Director, drafted a "Mental Health Progress Note" concerning DJ and his transfer to the Regional Jail.  The Progress Note prominently noted DJ's "Chronic" "Endocrine" "Problem," which was characterized as "Type 1 diabetes mellites with ketoacidosis without coma."  As discussed more fully below, that same information was "auto-populated" into the top of many of DJ's Regional Jail medical records. Determan recorded in her Progress Note in DJ's electronic medical chart that on February 20, 2018, the "Patient's [DJ's] medical and mental health history and current presentation [were] discussed during 1430 conference call."[7]  Determan observed that "Mental health [was] to respond as needed."

51.     Upon transfer to the Regional Jail, DJ was assigned to start that day (with no end day) a "2800 Diabetic/Calorie Controlled w/Snack" diet.  DJ was placed into segregated housing at the Regional Jail.

---

[6] CCS also served as the medical care contractor at the Regional Jail.

[7] Determan explained in the Progress Note that the "1430 conference call [was] made up of all of the receiving jurisdictions (Hampton, Newport News, Chesapeake, Portsmouth and Norfolk) that will be transport[ing] patients and patient care to HRRJ [the Regional Jail] [the] following day (intake date 02-21-2018)."

27

52.     On February 22, 2018, CCS RN Meredith McGee noted that DJ was "hearing voices, pts mood flipping from calm to hostile, refusing medical attention."  Determan "E-signed" the entry.

53.     According to information provided to Bettina Guyon-Ross, a Social Worker at Eastern State Hospital, while at the Regional Jail, DJ refused to accept all psychotropic medications, presented with verbal aggression, was responding to internal stimuli, and had to be placed into a "restraint chair."

### H.     On February 23, 2018, DJ Was Sent Via a TDO to Eastern State Hospital

54.     Two days after arriving at the Regional Jail, DJ was sent to Eastern State Hospital ("ESH") pursuant to a temporary detention order ("TDO").  ESH is another Virginia Department of Behavioral Health and Developmental Services mental health hospital.  The immediate transfer is indicative of the Regional Jail's inability to handle DJ's mental illness and Type 1 diabetes.

55.     While at ESH, DJ was administered both his psychotropic and diabetic medication.

56.     In his ESH discharge summary, sent to the Regional Jail and produced with its medical records, DJ's "Reason for Hospitalization" was recorded as "Not taking medications as prescribed," "Mood Disturbance" and "Psychosis."  His discharge medications included the antipsychotic medications Haldol (Haloperidol) and Abilify for Schizophrenia and Lantus (insulin, glargine) for Diabetes, along with Cogentin for extrapyramidal symptoms.  A seven-day supply was sent back to the jail with DJ.  It was noted that the two antipsychotics were prescribed because DJ had a "History of three (3) or more failed trials of monotherapy." DJ's primary diagnosis at discharge was Schizophrenia.  DJ's medical diagnosis was Diabetes

Mellitus Type 1.  DJ's Eastern State psychiatrist wrote that DJ should continue all current medications and diet and have his labs monitored, including Hemoglobin A1C, CBC, CMP, and lipids.  The ESH discharge record indicates that both Norfolk Community Services Board and Regional Jail medical staff were "made aware of case status."

57.     The "NURSING" section of DJ's ESH discharge paperwork states:

> Allows blood sugar checks 3x/day at 6 AM, 4 PM and 8 PM.  … On Latus 25 units subcu each morning with blood sugar parameters   On Lantus 9 units subcu at bedtime. Requires Diabetic snacks 2x/day. …

**I.     On March 9, 2018, DJ was discharged from ESH and transferred back to the Regional Jail**

58.     On March 9, 2018, after a 14-day hospitalization at ESH, DJ was transferred back to the Regional Jail.  In his discharge summary, which was provided to CCS personnel and found in CCS Regional Jail records, ESH Social Worker Guyon-Ross states, "Mr. Jones has a significant history of treatment for psychiatric illness starting as a juvenile.  He has been hospitalized at least 7 times in the past (Commonwealth Children Center x4; Riverside Behavioral Health x1 and Sentara Norfolk General Hospital x1)."

59.     Ms. Guyon-Ross further stated, "[a]t this time [March 9] Mr. Jones has been deemed stable enough to return to jail and will be discharged 3/9/18."  She further remarked that at ESH, "he has shown compliance with medication."

60.     On March 10, 2018, CCS employee Olga V. Barton, RN, referred DJ to a "Psychiatric Provider" and a "MH Professional" because DJ was "responding to internal stimuli" and "Audio hallucinations."  She recommended, "Lock down for his safty (sic)."

61.     Records indicate that CCS also obtained DJ's Riverside "After Visit Summary" and "Discharge Aftercare Instructions" concerning his treatment there in December 2017 and

29

January 2018 pursuant to TDO.  A handwritten note indicates that Dr. Moreno reviewed the records.

**J.**   **CCS was well aware in March 2018 that DJ had a "[h]istory of multiple psychiatric admissions"; a "history of being on multiple medications"; a "history of poor compliance with treatment"; and that he suffered from "diabetes Type 1"**

62.   In March 2018, CCS personnel were well aware: 1) that DJ *was not* taking his prescribed medications as ordered at the Regional Jail, and, 2) in contrast to the Regional Jail, when DJ was hospitalized at ESH, he *was* medication compliant.  "Refusal of Treatment" forms were completed by Regional Jail CCS employees in March 2018 concerning DJ.  Summaries of the contents of the forms are shown below:

| Date | Time | Box checked | Comment | Reason for Refusal | Patient signature |
|------|------|-------------|---------|--------------------|-------------------|
| March 10 | 4 p.m. | "Refused medication" | "P.M. [?]" | "pt. pulled away from me when I attempted to prick his finger; I went to get another lancet he then said 'I refuse'" | No; "pt. refused to sign" |
| March 11 | 8 a.m. | "Refused medication" | "halopendol 5 mg, benzotropine1 mg" | "I don't want it" | No; "refused to sign" |
| March 15 | 8:30 p.m. | "Refused medication" | "benzotropine 1mg" | "No" | No |
| March 16 | 8:30 p.m. | "Refused medication" | | "Don't want it" | No; "Refused to sign" |
| March 18 | 8 a.m. | "Refused medication" | "[unreadable] 1 mg PO; Haldol 5 mg PO" | "Did not [unreadable]" | No; "Refused to sign" |
| March 18 | 4 p.m. | "Refused medication" | "[insulin medication] for blood sugar 249" | "Did not [unreadable]" | No; "Refused to sign" |

30

| March 20 | a.m. | "Refused medication" | "Refused AM meds" | "I don't want them" | No |
|----------|------|---------------------|-------------------|---------------------|-----|

63.     On March 13, 2018, a CCS "Behavioral Health Psychiatric Provider Initial Evaluation" was completed by Mental Health Provider Ronny Meunier, who recorded the following concerning DJ's "Presenting Issue":

> Patient with a history of schizophrenia. He has a long history of mental illness.  He has a history of aggression and severe psychosis.  He was recently stabilized in the state psychiatric hospital.  He is on a depot medication [a slow-release, slow-acting form of medication] for his schizophrenia.  He is acting very strange and does appear to have psychotic process. …

64.     The foregoing Evaluation listed then-current psychotropic medications, to include Abilify Maintaina 400 mg q month, Haldol 5 mg bid for 1mg bid, and bentropine 1 mg bid.

65.     The Evaluation further noted that DJ had a **"[h]istory of multiple psychiatric admissions, at least 8.  History of being on multiple medications.  History of poor compliance with treatment."** (Emphasis added).

66.     For "Past Medical HX" the Evaluation notes, **"diabetes Type 1**." (Emphasis added).

67.     The Evaluation also documented a "history of self harm."

68.     Under "Mental Status Exam," the form noted various observations, including the following:

> Appearance:          Bizarre
> Speech:              Slowed
> Mood:                Irritable
> Thought Content:     Delusional, Hallucinations
> Insight:             Poor
> Judgment:            Poor
> Behavior:            Agitated

69.     According to the form, DJ's "Patient Problems" were "Type 1 diabetes mellitus with ketoacidosis without coma" and "schizophrenia."  The first entry ("Type 1 diabetes mellitus with ketoacidosis without coma") appears to have been "auto-populated."  In other words, whenever DJ's name was typed into CCS's work stations, "Type 1 diabetes mellitus with ketoacidosis without coma" was automatically displayed under the heading, "Patient Problems."

70.     On or about March 22, 2018, DJ was released from the Regional Jail.

71.     On April 6, 2018, DJ was charged with failure to appear after purportedly not appearing for a hearing at Norfolk General District Court.   A warrant was issued for his arrest.

**K.     On or about April 8, 2018, DJ was Arrested and Detained at Chesapeake Correctional Center**

72.     On or about April 8, 2018, DJ was arrested and detained at Chesapeake Correctional Center ("CCC" or the "Chesapeake Jail").

73.     In a CCC "Receiving Screening with Mental Health" dated April 8, 2018, Terrah L. Ferebee, LPN noted DJ's diabetes and recorded that his blood sugar level measured "High."  She recorded that DJ was "disoriented," had a "flat" affect and had a thought process that "does not make sense."  DJ's speech was "slowed," his mood "depressed," and he was "unable to sit still."  Ferebee further recorded in "Chart Notes" that DJ "displays abnormal behavior."

74.     Indicative of Chesapeake Jail's concern for his wellness, on April 8, 2018, DJ was placed on a "staggered 15 minutes" suicide watch by Nursing.

75.     On April 8, 2018, DJ's blood sugar was measured several times.  After being noted as "High" at booking at 11:30 am, DJ received on the orders of Alex P. Taylor, MD two types of insulin (Lantus-insulin glargine and Novolog-insulin aspart).  However, DJ's blood sugar remained "high" on two subsequent readings.  He was given more Novolog.  DJ still had a high reading thereafter and was given another type of insulin (Humalog-insulin lispro). His blood

32

sugar read 246 at a subsequent check and then 120 at 3:08 pm.  By 10:55 pm, DJ's blood sugar measured 87.

76.     On April 9, 2018, at 1:37 p.m., Saulo Ortiz, LCSW, completed a "Behavioral Health Suicide Watch Initial Assessment" concerning DJ.  The form indicates that DJ "was unwilling to comply with directives and presents as paranoid of other staff.  Client also reportedly unmedicated and in need of assistance with MH [Mental Health] care compliance." The Assessment indicates that the Suicide/Self-Harm Watch was precipitated after DJ was seen and evaluated in booking. Ortiz noted, "Inmate unable to comprehend the questions that was asked during intake.  Inmate displays abnormal behavior while screening.  Reports a history of mental illness as well as being admitted in a hospital for mental reasoning.  Inmate was unable to tell the writer where and when."  DJ's Mental Status Examination revealed, in pertinent part, the following:

| Appearance: | Client made no efforts to remain covered, walking around the cell naked |
| --- | --- |
| Speech: | Client maintained conversation with imaginary parties in his cell, then yelled to this clinician from the corner of the cell |
| Mood: | Client expressed anger towards this clinician when attempting interview, and yelled at others unseen.  Client then was calm talking to deputies. |
| Thought content: | Client actively responding to internal stimuli, and arguing with unseen parties. |
| Oriented to: | Client did not reflect orientation to any area. |
| Intelligence: | Unknown.  Client unwilling to respond. |
| Memory: | Unknown.  Client unwilling to respond. |
| Behavior: | Erratic.  Client would stand in the corner of the cell and refuse to engage in discussion with this clinician. |

77.     Records dated April 10, 2018 indicate that DJ "refused"[8] his psychiatric medication.  That circumstance led to DJ having a psychotic episode, as witnessed by Dr. John N. Russo, MD.  According to Russo, MD's April 10 record, DJ was acting "bizarre." Specifically, Russo, MD recorded that DJ was, among other things, "lying flat on the floor on his belly," he jumped up when spoken to, his "speech is rapid and pressured," and his "mood is liable with sudden changes from excessively happy to angry."  Dr. Russo reported that DJ was suffering from "suicidal ideations" and that his thinking was "grandiose and delusional."  Dr. Russo wrote that DJ was "responding to internal stimuli with auditory hallucinations." He added that DJ was "A DANGER TO HIMSELF AND OTHERS. HE SHOWS CLEAR SIGNS OF MANIA WITH PSYCHOSIS," and that DJ's "BLOOD GLUCOSE LEVELS ARE SEVERELY ELEVATED" and he was not compliant with diabetes care.  Dr. Russo recommended that DJ be evaluated for a TDO to Eastern State Hospital.  Such, however, did not occur until approximately nine days later.

78.     Later on April 10, 2018, DJ saw Alex P. Taylor, MD, who restarted basal insulin twice a day with meals.

79.     On April 11, 2018, Chesapeake Jail's "Behavioral Health Structured Progress Note" contains the following observations of DJ:

| Speech: | Liable erratic speech |
|---|---|
| Mood: | Liable. Client was initially patient but would then become fearful |
| Thought content: | Active auditory.  Active paranoid delusions. |
| Oriented to: | Not oriented to situation, place [or] time.  Client continued to refer to his sister.  Client also expressed no one kill him when he saw blood drawn from his arm. |

_____

[8]  The term "refused" is inapt as the term suggests an informed and conscious decision, which DJ was incapable of making as a result of his psychosis.

34

| Behavior: | Client was appropriate but tense and scared of others around him |
|---|---|

80.     On April 12, 2018, it was noted that DJ had low blood sugar.  Levels at 66, 55 and 53 were recorded.  DJ was provided with two glucose tabs and a bag lunch on each occasion. Also on April 12, it was noted that DJ's grandmother called the jail, providing information about DJ's Type 1 diabetes, schizophrenia, and bipolar disorder and his hallucinations when not on mental health medications.

81.     On April 13, 2018, lab tests were conducted on DJ.  The Hemoglobin A1C level was very high at 12.00%, suggesting poorly controlled diabetes.

82.     On April 14, 2018, Chesapeake Jail personnel placed DJ on suicide watch with "10-min precautions monitoring."  He was placed in a green smock. RN Chishaunna Calhoun wrote that DJ "verbalized he wanted to kill himself or die today" during his 8 a.m. diabetic check.  Mental health practitioner Antoinette Drakeford, MHP, wrote that day (April 14, 2018) that she was informed by a nurse that DJ was "responding to internal stimuli and presenting with bizarre behaviors."  Drakeford further noted that nursing reported that DJ was "incoherent" and stated that "he needs to be baptized."

83.     Concerning an April 15, 2018 visit with DJ, Takiyah Brown, MA, MHP noted DJ's earlier suicidal statements.  Brown referred to DJ's "loose association" of thoughts and "flight of ideas," and described his thought content as "delusional."  She wrote of DJ: "I/M [Inmate] reports concerns in regards to being a diabetic."

84.     On April 16, 2018, a Behavioral Health Progress Note, drafted by Chesapeake Jail employee/agent Saulo Ortiz, LCSW, states, in pertinent part:

 Client was observed talking to himself, yelling and walking around his cell naked. Client then walked to the window and banged his head on the window several times. Client

35

stood in the middle of the room shouting "they want to kill me – I cant let them kill me!" and got in a fighting stance. Client began crying stating "they want to kill me – they cant have my sister!" Clinician directed client to stop hitting his head on the window and client acknowledged and then immediately got quiet and laid down. Client got up again within 1 minute and began shouting and "shadow boxing" as well.

85. On April 18, 2018, DJ was seen again by CCC employee/agent Saulo Ortiz, LCSW. Ortiz wrote in a Behavioral Health Suicide Watch Daily Follow-Up and Discharge form about DJ's "erratic behavior and unmanaged diabetes." Ortiz commented that DJ's speech was "erratic, disjointed bizarre" and that his mood "fluctuates widely from anxious to angry and irritable to stable." Ortiz continued that DJ "continues to think someone is out to get him and he has people in his cell who are after him." DJ, Ortiz noted, "will slip in and out of orientation and confused conversations with his hallucinations and actual conversations." Ortiz described that DJ had both auditory and visual hallucinations and that he "does not often know where he is or how he got there. [DJ] has no understanding of date or time." Ortiz rated DJ's "estimated current self-harm/suicide risk level" as "high." Ortiz further commented that DJ "is unable to effectively manage decisions regarding his diabetes." Ortiz concluded that DJ "continues to exhibit erratic and impulsive behavior indicative of active psychosis" and "has expressed fear of fighting or dying as a result of messages he receives." Ortiz continued DJ's suicide watch and daily follow up.

86. Blood glucose readings for DJ from April 16, 2018 to April 18, 2018 show several high levels, including 353, 322, 560 and 385.

**L.** **On or about April 18, 2018, Records Indicate that DJ was Transferred from Chesapeake Jail to the Regional Jail**

87. On or about April 18, 2018, a "CCC Transfer of Medical Information" form was filled out for DJ at CCC. A CCS "HRRJ [Regional Jail] Transfer Checklist" was also filled out for DJ and dated April 18, 2018. The "Transferring Site" was listed as "Chesapeake

36

Correctional Center" or CCC.  The CCS "HRRJ Transfer Checklist" indicates that multiple

records for DJ were sent from CCC to the Regional Jail, including, among other things, his

Transfer Sheet, Receiving Screening Form, History/Physical Form, Chronic Care form, labs,

vital sign records, Summary page, medications, current medication list, Initial MH [mental

health] Evaluation and recent Progress Notes, special needs information including suicide

precautions, Initial Psychiatry Evaluation and recent Psychiatry Progress Notes, and chart notes.

Records meeting these descriptions were found in the medical records received from the

Regional Jail pre-litigation. CCS was made well aware of DJ's medical circumstances at

Chesapeake Jail.

**M.**     **On April 19, 2018, pursuant to another TDO, DJ was sent back to ESH**

88.     On April 19, 2018, DJ was sent back to ESH, pursuant to another TDO.  The

transfer occurred nine days after Dr. Russo's suggestion that another TDO be pursued for DJ.

89.     According to a section of the ESH discharge records signed by Marykate Sinclair,

BSW [Bachelor of Social Work], who holds the position of "Counselor II," DJ was admitted to

ESH on a TDO due to, among other things, "refusing to accept all psychotropic and medical

medications in the jail" and acting in a verbally aggressive manner.  On admission, DJ was

"placed on Continuous Supportive Observation due to critical/high-risk behavior and self

injury/harm to self."

90.     While at ESH, DJ was evaluated by Dr. Mukesh Patel.  Dr. Patel recorded in

discharge records that the reasons for DJ's hospitalization were: "Not taking medications as

prescribed," "Mood Disturbance," and "Psychosis."  He noted "F20.9 Schizophrenia" as a

primary diagnosis at discharge, as well as "Diabetes Mellitus Type 1" as a medical diagnosis. Dr.

Patel's ESH discharge instructions included, "Continue all current medication and Diet"

"Monitor Labs: CBC, CMP, HgbA,C, TSH, Lipids."  In the instruction, Dr. Patel observed that

DJ has "hyper-religious delusions of God."

91.     Nursing discharge instructions included:

Diet: 1600 Kcal/CHO, no concentrated sweets, normal portions, double vegetables, provide hot sauce with meals, tossed large salad with meals Diabetic snack at bedtime. Continue Humalog 100 units /ml vial sliding scale subcutaneously two times per day as needed.  Give Lantus 100 units/ml vial 9 units subcutaneously every 4:30pm.  Continue all medications as order do not abruptly discontinue medication without speaking to your physician. ...

92.     While at ESH, DJ "remained medication and diet compliant" and also denied any

thoughts of hurting himself or others.  He denied auditory and visual hallucinations.

93.     ESH "Counselor II" Marykate Sinclair observed in discharge records that DJ will

need "outpatient mental health services and substance abuse services with the Norfolk CSB

following his release from jail.  Medication Management is recommended."

94.     DJ was scheduled to receive an Abilify shot prior to discharge.  Abilify, an

antipsychotic, was listed in his discharge records as a medication for schizophrenia. Lantus 100

units/ml (Insulin, Glargine) was also listed as a discharge medication, for diabetes; the dose was

25 units vial each morning and 20 units vial every 4 pm.

**N.     On April 25, 2018, DJ was discharged from ESH to the Chesapeake Jail**

95.     On April 25, 2018, DJ was discharged from ESH to the Chesapeake Jail.

**O.     On or about April 25, 2018, DJ was transferred to the Regional Jail**

96.     On or about April 25, 2018, DJ was transferred from the Chesapeake Jail to the

Regional Jail.  Again, a CCS "HRRJ Transfer Checklist" dated April 25, 2018 indicates that DJ's

medical records were sent from the Chesapeake Jail to the Regional Jail, including, among other

things, his Transfer Sheet, Receiving Screening Form, History/Physical Form, Chronic Care

form, labs, vital sign records, Summary page, medications, current medication list, mental health

records, Initial MH [mental health] Evaluation and recent Progress Notes, special needs information including suicide precautions, suicide watch information, and Initial Psychiatry Evaluation and recent Psychiatry Progress Notes. Records meeting these descriptions were found in the medical records received from the Regional Jail pre-litigation. In particular, DJ's ESH discharge records from his recent April 2018 TDO hospitalization were contained in the medical records from the Regional Jail received pre-litigation.

97.     On April 26, 2018, DJ underwent a "Receiving Screening" and "Medical History and Physical Assessment with Mental Health" at the Regional Jail administered by CCS RN Damika M. Baugh. DJ's "Chronic" "Endocrine" "Problem," described more specifically as "Type 1 diabetes mellitus with ketoacidosis without coma," appears under "Patient Problems." It is cited as a problem dating back to February 21, 2018, when it was first documented by CCS. "Insulin" was listed as a medication that DJ was on, as was his psychotropic medication Abilify. DJ's recent ESH hospitalization just that month was also documented on both forms. The forms further noted that DJ was on a specific diet prescribed by a physician, described as "2800 Diabetic/Calorie Controlled w/Snack." DJ's vital signs were recorded on the forms as BP 115/80, Pulse 76, Resp. 18, Temp 98.3, Pulse Ox 97, Weight 136, BMI 22.6. He was noted to have a "flat" affect.

98.     On the "Medical History and Physical Assessment" form, DJ's level of cognitive functioning was noted to be "Below Average," his speech "slowed" and behavior "slow." He was noted to have auditory hallucinations. On the "Receiving Screening" form, he is further noted to be "disoriented."

99.     A section of the "Receiving Screening" form called "Suicide Potential Screening" indicated the following concerning DJ:

- Has psychiatric history (psychotropic medication or treatment).
- Expresses feelings there is nothing to look forward to in the future (feelings of helplessness and hopelessness).
- Shows signs of depression (crying or emotional flatness).
- Is acting and/or talking in a strange manner.  (Cannot focus attention/hearing or seeing things not there).

As a result of "acute problems" noted, including "psychosis, suicidal," an immediate referral to Mental Health was sought for DJ and documented on the "Receiving Screening" form.  DJ was placed in mental health housing and on suicide precautions.

100.    On that day (April 26), DJ was placed on "non acute suicide watch" for one day.

101.    On April 27, 2018, at 10:25 a.m., Christina Ledford, RN, recorded an order by Dr. Moreno to check DJ's blood sugar "BID AM & PM for 30 days."

102.    On April 27, 2018, at 10:25 a.m., Christina Ledford, RN, recorded an order by Dr. Moreno for Lantus U-100 Insulin (Insulin Glargine) 100 unit/mL subcutaneous solution: give 20 unit SC Diabetic PM for 14 days.  This medication was to start on April 27 and end after administration on May 10.

103.    Ledford also recorded another order by Dr. Moreno at the same time, for Lantus U-100 Insulin (Insulin Glargine) 100 unit/mL subcutaneous solution: give 25 unit SC Diabetic AM for 14 days.  This medication was to start on April 28 and end after administration on May 11.

104.    **There is no indication as to why the Insulin Glargine medications were to be halted on May 10 and 11, 2018.  Also, there is no record that this medication was re-started after those dates.**  *See* the related chart shown below. Dr. Moreno had previously prescribed insulin to DJ during his February and March 2018 detentions at the Regional Jail.  Dr. Moreno

40

had also been twice called in February about DJ's blood glucose reaching very high levels (424 and 509), and had given orders for immediate insulin injections.

105.    On April 27, 2018, at 10:26 a.m., Christina Ledford, RN recorded an order by Ilana Lacobovici for Abilify Maintena (aripiprazole) 400 mg suspension, extended rel. intramuscular syringe give 1 suspension, extended rel syring IM 1x Month AM for 1 days.  The medication was to start May 1.

106.    On April 27, 2018, at or about 10:46 a.m., Dr. Moreno (via a telephone order to S. Pifer, RN) ordered the following diabetes medications to be administered at the following times:

- Insulin lispro (U-100) 100 unit/mL subcutaneous solution: give 12 unit SC Now for 1 days.

- Insulin lispro (U-100) 100 unit/mL subcutaneous solution: give units per sliding scale protocol SC Diabetic BID AM & PM for 30 days.

- Metformin 500 mg tablet: give 1 tablet PO BID AM & PM for 30 days.

107.    On April 27, 2018, at 4:18 p.m., B. Gilmore-Hicks, LCSW authorized DJ to be removed from Suicide Watch and transferred to "general population."  Hicks also indicated that DJ was to receive a regular tray. Concerning the question on a suicide watch discharge form also dated April 27 as to whether DJ was medication compliant, Hicks incorrectly stated "N/A."

108.    At 4:51 p.m. on April 30, 2018, Christina Ledford, RN, noted in DJ's chart, "Pt agreed to allow nurse to take his BG [blood glucose] after nurse documented refused in POCC. Pt's blood glucose was 251 and was administered 10 units Lantus per order.  Pt would not allow nurse to administer sliding scale insulin after Lantus injection.  Pt appears anxious and pacing floors.  Will monitor closely."

109.    On May 1, 2018, a Regional Jail "REFERRAL FOR PSYCHOLOGICAL REVIEW" noted that DJ "needs to see Mental Health."  The referral noted "ACTING OUT" and

41

"DISILLUSION" as behavior observed.  Records indicate that DJ was again placed in segregated housing on the evening of May 1.

110.    A Progress Note indicates that DJ's initial segregation rounds vital signs were completed on May 3, 2018 at 4:10 p.m.  They measured: blood pressure, 117/83; pulse, 99; respiration, 16; temperature, 98.3.  His weight was "129."

111.    A CCS "Mental Health Weekly Segregation Rounds Form" pertaining to the week of May 5, 2018 conflicts with other records and indicates that DJ was "Compliant" with "Psych Meds."

112.    However, on May 8, 2018, DJ was seen via "telemedicine" for a "Behavioral Health Psychiatric Provider Follow Up" by Defendant Dr. Shah.  Dr. Shah noted DJ's "his [history] of schizo [schizophrenia]."  Dr. Shah wrote that DJ was "not on any meds," but indicated that DJ had taken Abilify by injection, Haldol and Cogentin in the past.  As noted below, DJ had not received a prescribed Abilify injection on May 1 at the Regional Jail.  Dr. Shah wrote that DJ "refuses all psych meds" and "does not want to see MH anymore." Despite DJ's not taking antipsychotic or other psychotropic medications, Shah recorded, "pt says he is ok and stable." Shah further recorded, "no depression, no anxiety, no si/hi [suicidal/homicidal ideations], no a/v hallu [hallucinations], calm and cooperative." Dr. Shah indicated that follow up would be on a "prn," or "as needed" basis.

113.    Upon seeing DJ via telemedicine on May 8, it is a reasonable inference that Shah, MD, would have reviewed DJ's medication records and would have learned that, in addition to not taking psychotropic medication, DJ was not taking diabetes medication as prescribed either. The "Follow Up" form that Shah filled out has a section called "Diagnosis (include mental disorders and relevant medical conditions)."  Under the Diagnosis section, "Type 1 diabetes

42

mellitus with ketoacidosis without coma" is listed as a "Patient Problem[]," dating back to

February 21, 2018.  It again appears that this "Patient Problem[]" of Type 1 diabetes would have

popped up and auto-populated for Shah when he filled out the form, commanding his attention.

Also, the failure to accept psychotropic medications would have implicated non-compliance with

other medications.  Additionally, DJ's very recent ESH TDO hospitalization and discharge

information was known to CCS and the Regional Jail, as was his previous TDO from the

Regional Jail.  CCS records indicate that Shah had also prescribed psychotropic medications for

DJ in February and March of 2018 when DJ was at the Regional Jail, and so would have known

about medication compliance problems at those times as well.  In the face of DJ's documented

non-compliance with medications, Dr. Shah's notation to follow up "PRN" [as needed],

including apparently if DJ himself "will send a request," is a shocking abandonment of Dr.

Shah's healthcare role.

114.     On May 9, 2018, a handwritten Segregation Initial Healthcare Assessment

indicates that DJ was "illogical" and was "talking to other person in head."  The form appears to

have been completed by "Shaw, RN."  Nurse Shaw did not refer DJ to Mental Health because he

was "already being followed by MH."

115.     On May 10, 2018, an "Urgent" "Staff Referral Form Mental Health" was filled

out by Dedra Williams, RN.  In addition to noting the previous record regarding DJ having been

"talking to other person in head," Williams wrote that on May 9, 2018, DJ was "locked down for

homicidal thoughts and a statement of self harm." The record mentions DJ having been locked

down, but not put on watch by medical. The Staff Referral form to Mental Health references

DJ's having "refused all MH [mental health] tx [treatment]" when he saw Dr. Shah and Dr.

Shah's having put DJ on "prn" (as needed) follow up.  It also referenced that DJ was "not

43

currently on MH meds."  The referral form was addressed to "Psychiatric Provider" and "MH

Professional."  Such indicates that Dr. Shah would have received the alert about a patient he had

just seen, but there is no record that Shah saw DJ thereafter.

116.    A CCS "Mental Health Weekly Segregation Rounds Form" for May 11, 2018 was

completed, excepting the part concerning whether DJ was taking his antipsychotic medications,

which was left blank.

**P.      In May 2018, CCS was well aware that DJ was not taking as prescribed the
very medications that permitted him to live**

117.    A review of DJ's Regional Jail medical records makes clear that in May 2018,

CCS was well aware that DJ was barely taking his life-supporting medications. The record

indicates that on May 1, DJ was prescribed an Abilify injection for his schizophrenia.  The

record further indicates that from May 1-11, 2018, DJ was prescribed the following medications

and interventions related to his diabetes:

- Blood sugar checks twice a day, in the morning and afternoon

- Lantus U-100 Insulin (Insulin Glargine) 100 unit/mL subcutaneous solution: 20
  unit SC Diabetic, every afternoon
  (this dosage would be last given on May 10 due to being an afternoon medication)

- Lantus U-100 Insulin (Insulin Glargine) 100 unit/mL subcutaneous solution: 25
  unit SC Diabetic, every morning

- Insulin lispro (U-100) 100 unit/mL subcutaneous solution: units per sliding scale
  protocol SC Diabetic, twice a day, in the morning and afternoon

- Metformin 500 mg tablet: 1 tablet by mouth, twice a day in the morning and
  afternoon

118.    Thereafter, from May 12 through his death on May 15, 2018, DJ was prescribed

the following medications and interventions for diabetes:

- Blood sugar checks twice a day, in the morning and afternoon

44

- Insulin lispro (U-100) 100 unit/mL subcutaneous solution: units per sliding scale protocol SC Diabetic, twice a day, in the morning and afternoon

- Metformin 500 mg tablet: 1 tablet by mouth, twice a day in the morning and afternoon

119.    However, the following exceptions are shown on the May 2018 CCS medication administrations record, indicating that DJ did not receive the following doses and interventions prior to his death on May 15 at 4:53 a.m.:

| Date | Time | CCS employee | Item | Status |
|------|------|--------------|------|--------|
| May 1 | 08:00 | DB | Abilify Maintenance (aripiprazole) 400 mg suspension, extended rel. intramuscular syringe | Hold One Medpa |
| May 1 | 16:05 | TLM | Vitals: Blood Sugar | Out Of Unit |
| May 1 | 16:05 | TLM | Lantus U-100 Insulin (Insulin Glargine) 100 unit/mL subcutaneous solution | Out Of Unit |
| May 1 | 16:05 | TLM | Insulin lispro (U-100) 100 unit/ml subcutaneous solution | Out Of Unit |
| May 2 | 04:05 | RAM | Vitals: Blood Sugar | Out Of Unit |
| May 2 | 04:05 | RAM | Lantus U-100 Insulin (Insulin Glargine) 100 unit/mL subcutaneous solution | Out Of Unit |
| May 2 | 04:05 | RAM | Insulin lispro (U-100) 100 unit/ml subcutaneous solution | Out Of Unit |
| May 3 | 08:00 | SB | Metformin 500 mg tablet | Refused |
| May 4 | 04:05 | KH | Insulin lispro (U-100) 100 unit/ml subcutaneous solution | Refused |
| May 4 | 08:00 | SB | Metformin 500 mg tablet | Refused |
| May 5 | 04:05 | JL | Vitals: Blood Sugar | Refused |
| May 5 | 04:05 | JL | Lantus U-100 Insulin (Insulin Glargine) 100 unit/mL subcutaneous solution | Refused |
| May 5 | 04:05 | JL | Insulin lispro (U-100) 100 unit/ml subcutaneous solution | Refused |

| May 6 | 04:05 | NP | Insulin lispro (U-100) 100 unit/ml subcutaneous solution | Hold One Medpa |
| May 7 | 16:05 | DB | Vitals: Blood Sugar | Refused |
| May 7 | 04:05 | KH | Insulin lispro (U-100) 100 unit/ml subcutaneous solution | Hold One Medpa |
| May 7 | 16:05 | TLM | Lantus U-100 Insulin (Insulin Glargine) 100 unit/mL subcutaneous solution | Refused |
| May 7 | 16:05 | DB | Insulin lispro (U-100) 100 unit/ml subcutaneous solution | Refused |
| May 9 | 04:05 | KH | Lantus U-100 Insulin (Insulin Glargine) 100 unit/mL subcutaneous solution | Refused |
| May 9 | 04:05 | KH | Insulin lispro (U-100) 100 unit/ml subcutaneous solution | Refused |
| May 9 | 20:00 | RAM | Metformin 500 mg tablet | Refused |
| May 10 | 04:05 | RAM | Lantus U-100 Insulin (Insulin Glargine) 100 unit/mL subcutaneous solution | Refused |
| May 10 | 16:05 | TH | Vitals: Blood Sugar | Refused |
| May 10 | 04:05 | RAM | Insulin lispro (U-100) 100 unit/ml subcutaneous solution | Refused |
| May 10 | 16:05 | TH | Lantus U-100 Insulin (Insulin Glargine) 100 unit/mL subcutaneous solution | Refused |
| May 10 | 16:05 | TH | Insulin lispro (U-100) 100 unit/ml subcutaneous solution | Refused |
| May 13 | 04:05 | SMJ | Vitals: Blood Sugar | Refused |
| May 13 | 04:05 | SMJ | Insulin lispro (U-100) 100 unit/ml subcutaneous solution | Refused |
| May 13 | 08:00 | AH | Metformin 500 mg tablet | Refused |
| May 14 | 16:05 | TH | Vitals: Blood Sugar | Refused |
| May 14 | 16:05 | TH | Insulin lispro (U-100) 100 unit/ml subcutaneous solution | Refused |
| May 14 | 20:00 | RAM | Metformin 500 mg tablet | Refused |

46

| May 15 | 04:05 | RAM | Vitals: Blood Sugar | Hold One Medpa |
| May 15 | 04:05 | RAM | Insulin lispro (U-100) 100 unit/ml subcutaneous solution | Hold One Medpa |

According to the foregoing records, in May 2018, *DJ received only a fraction of the diabetes medication that he was supposed to receive, and no mental health medications at all.* As a Type 1 diabetic, DJ's not receiving adequate diabetes medication was exceedingly dangerous. As noted above, in Type 1 diabetes, the body *does not produce insulin*. Insulin is a hormone the body needs to transport glucose from the bloodstream into the cells of the body. In the absence of insulin to transport glucose, *the body starts feeding off itself.*

120.    Throughout DJ's file there are notes that he "refused"[9] to take his medications and treatments. In the month of May 2018, CCS records indicate that he refused medications 18 times, and five times refused to have his blood sugar checked. According to DJ's chart, the following medical staff members, at separate times, were medication/treatment administrators for "refusals": Jessica Langham RN (May 5 at 4:05 a.m.); Avagail Harrison MA/LNA (May 13 at 8:00 a.m.); Donna Boutte, RN (May 7 at 4:05 p.m.); Kimberly Harrell, RN (May 4 at 4:05 a.m.; May 9 at 4:05 a.m.); Robin Mizelle, MA/LNA (May 9 at 20:00; May 10 at 4:05 a.m.; May 14 at 20:00); Shelmara Johnson MA/LNA (May 13 at 4:05 a.m.); Terry Mikeska, RN (May 7 at 16:05); Tamyra Harris, LPN (May 10 at 16:05; May 14 at 16:05); and Shaneka Brown, RN and/or Sammy Best, MA/LNA (May 3 at 8 am and May 4 at 8 am; they have the same initials in the system). Reporting purported refusals of medication and treatments is an important element of patient care. Per CCS's policy during the relevant period, alleged refusals of medication were

_____

[9] As stated in Note 8 above, the term "refused" is inapt as the term suggests an informed and conscious decision, which DJ was incapable of making as a result of his psychosis.

required to be reported to the prescriber after three such occurrences. However, there is no record that any of the above-listed medical staff members informed any of their supervisors/ physicians/ nurse practitioner or that they sought help for DJ.

121.    DJ's dangerous Type 1 diabetes medical condition, fostered by his mental health decline, was also underscored to CCS personnel in Refusal of Treatment forms completed by CCS employees in May 2018.

| Date | Time | Box checked | Comment | Reason for Refusal | Patient signature |
|---|---|---|---|---|---|
| May 3 | 8 a.m. | "Refused medication" | "Metformin 500 m.g." | "Did not consent" | No; "Refused to sign" |
| May 4 | 8 a.m. | "Refused medication" | "Metformin 500 mg po [unreadable] | "Did not consent" | No; "Refused to sign" |
| May 5 | 4:43 a.m. | "Refused medication" and "Other" | "Fingerstick" | "n/a" | No; "Refused" |
| May 8[10] | 6:30 p.m. | "Refused medication" | "Blood Glucose check and insulin PM" | "No reason given" | No |
| May 9 | 415 a.m. | "Refused medication" | "Refused insulin post BS check" | "Not given/ did not want insulin post BS check/ attempted twice" | No; "Refused" |
| May 9 | 10:55 p.m. | "Refused medication" | "All PM meds" | "Didn't [want]" | No; "Refused to sign" |
| May 10 | 9 a.m. | "Other" [not specified] | | "Pt. started yelling and screaming and | No; "Refused" |

_____

[10]  This encounter was not documented in the computerized medication administration record.  The refusal forms are handwritten and therefore less legible. Nonetheless, one of the handwritten nurse signatures on this refusal form appears to state C. Ledford, RN.  There is no record that Nurse Ledford informed any of her supervisors/physicians/nurse practitioner or that she sought help for DJ in the face of his refusals.

| | | | | will not cooperate in the administration of his insulin" | |
|---|---|---|---|---|---|
| May 10 | 4:05 a.m. | "Other" | "Insulin" | "Stated don't need insulin anymore blood sugar was 267" | No; "Refused to sign" |
| May 13 | 5:32 a.m. | "Refused medication" | "a.m. diabetic check" | Pt. stated "I'm good" | No; "pt. refused" |
| May 13 | 8 a.m. | "Refused medication" | "pt. refused am meds" | "pt. ignored staff" | No |
| May 14 | 4:30 p.m. | "Other" | "refused seg round vitals" | "states no" | No; "refuse" |
| May 14 | 10:15 p.m. | "Refused medication" | "All pm meds" | "Didn't want" | No; "Refused to sign" |

122. Most notable among these forms was the form filed on May 10 at 9:00 a.m. when LPN T. Harris recorded that DJ "started yelling and screaming." It would be reasonable to assume that because DJ was expressing considerable distress and was also not taking diabetes medication as prescribed or mental health medication, Harris would have taken some action to help him. However, it does not appear from records that she did so.

123. As shown above, multiple "Refusal of Treatment" forms also were not signed by DJ; many times, he is said to have refused to sign the refusal form. Still, it does not appear that any intervention was made.

124. DJ's blood sugar readings during the period from May 6, 2018 through May 13, 2018 were 94, 346, 179, 247, 247, "N/A," 267, 348, 325, 282, 400, and 409, respectively. Previous medication orders directed that insulin be provided to DJ in increasing amounts when DJ's blood sugar rose. On the morning of May 14, 2018, DJ's blood sugar was 107. DJ's blood glucose could vary greatly in the course of a day. For example, his blood glucose purportedly

measured 103 at 11:05 a.m. on March 13, 2018.  However, that number rose to 295 by 4:05 p.m. that day.  No blood sugar readings were recorded for DJ on the afternoon and evening of May 14, 2018 or the morning of May 15, 2018 – the time preceding DJ's death.

**Q.**      **On May 14, 2018, DJ was transported to the Norfolk General District Court**

125.      On May 14, 2018, DJ was scheduled to appear in Norfolk General District Court for a hearing on a misdemeanor charge. (In addition to that charge, DJ was being held at the Regional Jail on charges pending in Chesapeake.)

126.      According to a Daily Confinement Record in the CCS Regional Jail records, DJ was administered his medication at 9:00 a.m. on May 14.  Electronic medication administration records also indicate that DJ received his morning doses of insulin lispro and Metformin on that day.  Along with his diabetic medication, DJ should have been on a diabetic meal plan, crafted to keep his blood sugar in check.  However, the Daily Confinement record indicates that he did not have an "Alternative Meal Service" as of May 14.  The mention of a regular tray in an April 27 record discussed above also indicates that a diabetic meal plan was not being followed.

127.      DJ was transported to Norfolk General District Court by Norfolk Sheriff's deputies.  When DJ's case was called, he needed assistance to stand up.  Also, he had to be physically supported by deputies as he came out of lockup and while he was standing at the podium.  When DJ entered the courtroom, an onlooker heard DJ say, "Help.  I'm about to pass out.  I can't stand up."  She heard DJ make statements that made it clear to the judge that he was diabetic, had not eaten, and needed insulin.

128.      DJ's grandmother was present in court that morning.  She stood up and likewise advised Judge Bruce A. Wilcox that DJ was diabetic and must need medicine.

129.    Judge Wilcox continued the case as DJ was unable to participate in the hearing.  The judge directed DJ's Public Defender Michelle Monfiletto to contact the Regional Jail staff and advise them that her client required medical attention.

130.    Judge Wilcox then set a $5,000 personal recognizance bond so that DJ would not be held in custody on the Norfolk charges.  However, because of the bond status on the Chesapeake charges, DJ remained in the custody of Defendant Baron, the Norfolk Sheriff. Despite DJ's condition, it does not appear that Sheriff Baron or his deputies did anything to address DJ's condition other than to deliver him back to the Regional Jail.

131.    DJ's Public Defender Michelle Monfiletto advised the head of her office, Sherry Carr, of the situation.  At or about 10:29 a.m., emails indicate that Ms. Carr had communicated with "the powers that be" at the Regional Jail concerning DJ's condition.  Ms. Carr was informed that DJ's medical issues would be addressed.  Ms. Carr spoke with Defendant Linda Bryant, who at the time served as the Assistant Superintendent, and Defendant April Green, who served as HSA.  Carr sent an email to Monfiletto at 1:12 p.m. on that same day, May 14, 2018, stating that she had learned that DJ was not back at the Regional Jail yet, but that "they" indicated that "he has been med compliant… They are following up with Norfolk since he is still here to check his blood sugar and feed him more if necessary."

132.    Conversely, when Mary Jones, DJ's grandmother, called the Regional Jail around the same time, she was informed he was fine and was back at the Regional Jail.

133.    There is no record that DJ was seen by the medical staff at Norfolk Jail nor any record indicating that DJ was taken to a hospital by Sheriff Baron's deputies despite their clear understanding of DJ's acute condition.

51

134.    A single-page medical note from the Norfolk City Jail concerning DJ and dated May 14, 2018 at 1:20 p.m. notes, "received report from April Green HSA at HRRJ [the Regional Jail] per Green, patient came to Norfolk for court, lawyer then reported patient was displaying slowed responses, concerned patient might be hypoglycemic [low blood sugar] attempted to locate patient, patient in discharged status in ERMA and OMS team commander's contacted for assistance in locating patient. per team commander's, patient on his way back to HRRJ as of 1320."

135.    Despite Ms. Green's concern, DJ was not seen by a physician or sent to a hospital. He was not even housed in the Medical Department at the Regional Jail.  Nor is there a record from Green in the Regional Jail's medical records. Like Green, Moreno, MD, Medical Director; Barton, RN, DON; and Determan, MHD, also worked full time and would have been working when DJ was brought back to the Regional Jail.  They were aware of DJ due to their duties at the Regional Jail which required them to be familiar with patients with chronic health care needs. With regard to Moreno, MD, he was also aware of DJ because he had prescribed diabetes medication to DJ; with regard to Determan, MHD, she was aware of DJ because she had previously communicated with other jurisdictions concerning his medical status and presentation.  However, there is no indication that any of these providers assisted DJ either.

136.    At about 16:30 (4:30 p.m.), Aimee Lancaster, MA/LNA created a "Refusal of Treatment" form stating that DJ refused his segregation round vitals.  Under "Reason for Refusal," Lancaster wrote "states no."  The "Reason for Refusal" was "didn't want."  The form indicates that DJ refused to sign.  A handwritten CCS "Segregation Rounds Log," completed by MA/LNA Lancaster at 4:30 p.m. on May 14, also indicates that DJ refused vitals.  However, the foregoing notations do not conform with a May 14, 2018 Progress Note made at *9:04 pm.* by

Lancaster, MA/LNA, stating, "segregation rounds vitals refused.  Refusal form completed."  The

9:04 pm. entry does not bear a "late entry" notation and varies in time by approximately 4 ½

hours from the time denoted in the 4:30 p.m. "Refusal of Treatment" form.  As noted above, the

medication administration records indicate that Tamyra Harris LPN recorded that DJ refused

administration of insulin lispro and a blood sugar reading on the afternoon of May 14, 2018, at

approximately 16:05.

137.     Moreover, LeRoyal Parker, a Mental Health Professional, entered DJ's medical

records on May 14, 2018 at 4:47 p.m., and "E-Signed" the "Urgent" "Staff Referral Form" from

Dedra Williams, RN, dated May 10, 2018.  Williams's referral had been addressed to

"Psychiatric Provider" and "MH Professional." It had asked for an evaluation of DJ after he was

locked down for homicidal thoughts, a statement of self harm, and reportedly was "talking to

other person in head." It does not appear that any other mental health professional had previously

addressed the referral (including Dr. Shah).  However, notwithstanding such and the additional

troubling records created in CCS's database thereafter, the record indicates that Parker merely

signed the form, but did not intervene to help the acutely ill DJ.  There is no note from Parker in

the record concerning examining DJ on May 14 or thereafter, much less any intervention.

138.     At 10:15 p.m. on May 14, 2018, another "Refusal of Treatment" form was created

stating that DJ allegedly "Refused" "All pm meds."  Under "Reason for Refusal," the form states

"Didn't want."  The form again states that DJ "refused to sign" it.  The staff signatures on this

form are illegible.  However, as noted above, medication administration records indicate that

Robin Mizelle MA/LNA recorded a refusal by DJ of the latest-scheduled medication that he was

supposed to receive that night, which was scheduled to be administered at 20:00.

139.    DJ was a known Type 1 diabetic, who had not been taking his diabetic medications as prescribed for a considerable time period, and who displayed signs and symptoms of hyperglycemia (when an excessive amount of glucose circulates in the blood) so prevalently that his hearing was suspended so that he could obtain treatment.  Yet, astoundingly, DJ was neither seen by a physician nor sent to a hospital and then CCS documented in writing his continuing purported "non-compliance" with his diabetes medication. DJ was also a known schizophrenic who was not on mental health medication.  If CCS/Regional Jail personnel believed that they could not properly respond to his medication non-compliance, they should have sought an immediate TDO to ESH or another hospital.

140.    Also, upon returning to the Regional Jail, DJ undoubtedly displayed the symptoms associated with diabetic ketoacidosis (DKA), including, but not limited to, excessive thirst, frequent urination, nausea and vomiting, abdominal pain, shortness of breath, and confusion.[11]  The Medical Examiner described that "Vomitus emanates from the nose and mouth," indicating that DJ was vomiting.  However, Regional Jail correctional officers and CCS staff ignored his symptoms and likely pleas for help.

141.    The disregard shown to DJ and others can be seen in DJ's Regional Jail "Daily Confinement Record."  In the record, a correctional officer initials that DJ was provided

---

[11]  In the absence of insulin, the body can no longer move glucose from the blood into the cells, causing high blood glucose levels. If the glucose level is high enough, excess glucose spills into the urine. This drags extra water into the urine causing more frequent urination and thirst. This leads to dehydration, which can, in turn, cause confusion.  In addition, with too little insulin, the cells cannot take in glucose for energy and other sources of energy (such as fat and muscle) are needed to provide this energy. This makes the body tired and can cause weight loss. If this continues, patients can become very ill. This is because the body attempts to make new energy from fat and causes acids to be produced as waste products.  Ultimately, this can lead to coma and death if medical attention is not sought.

recreation, a shower, a telephone call, and medication during the second and third medication passes on May 15, 2018.  Subsequently, *those entries were crossed out* and a correctional officer recorded "[i]nmate was deceased on 5 /15/18."  The changes reflect that the forms were completed *en masse* and do not reflect accurate observations of DJ's condition on the morning of May 15, 2018.  In other words, Regional Jail correctional officers were not observing DJ in the early morning hours of May 15, 2018, or were doing so in a shoddy, indifferent manner.

> **R.   At 4:29 a.m. on May 15, 2018, DJ was found unresponsive in his cell**

142.    According to a CCS Emergency Response Worksheet, at 4:29 a.m. on May 15, 2018, DJ was found unresponsive in his cell, denoted to be "HU-3, POD 1, A-211."   The Worksheet indicated an awareness of DJ's medical history, noting "Type 1 Diabetes, Mental Health."  The Medical Examiner's Investigator would later note that per the Portsmouth Police Department, when DJ was found unresponsive, he was also "supine on the floor of his cell."

143.    The CCS Emergency Response Worksheet identifies DJ's condition when found: breathing – Absent; skin – Pale, Cool and Cyanotic [bluish]; Pupils- Dilated, size 10 ml.

144.    A code "10-52" was called and one minute later it was upgraded to a "code Blue." According to the Worksheet, at 4:31 a.m. other nurses arrived on site.  The Worksheet indicates that CPR was already in progress.  Per the Worksheet, an automatic external defibrillator was applied, but no shock was advised.

145.    At 4:33 a.m., 911 was called.

146.    At 4:42 a.m., CPR was stopped and the AED was used with the shock.  CPR resumed.

147.    Six minutes later, EMS arrived on site and took over the care of the patient.

148.     At 4:53 a.m., CPR was halted and DJ was declared dead.  The CCS staff present were M.K. Huck, RN; J. Langham, RN; C. Johnson, CPN; C. Stanley, LPN; and R. Mizelle, CMT.  "Security" staff present were Sergeant Frey; Officer Jordan; and Officer Kithcart.

149.     At 7:40 a.m., almost three hours after DJ was declared dead, R. Mizelle, MA/LNA, recorded a "late entry" concerning DJ in the electronic medical record.  She wrote, "Went to do diabetic check on inmate this morning and he was unresponsive and a code was called on him."

150.     The Emergency Response Worksheet, completed by Nurse Huck after DJ was found unresponsive, said DJ had taken Metformin 500 mg at 20:00 (8:00 p.m.) on May 14, 2018.  However, that conflicts with the electronic medication administration record which indicates the opposite – that DJ refused the Metformin he was prescribed to take at 20:00 on May 14.  Such also conflicts with the May 14 "Refusal of Treatment" form which indicated that DJ allegedly "Refused" "all pm meds."  Apart from the Worksheet, there is no record – and no contemporaneous, or pre-death, record – of DJ being administered any medication on the afternoon or evening of May 14, 2018.

**S.     DJ's cause of death was determined to be "DIABETIC KETOACIDOSIS DUE TO TYPE 1 DIABETES MELLITUS"**

151.     On the morning of May 15, 2018, DJ's body was taken to Tidewater District Medical Examiner's Office, and an autopsy was commenced the same day at 10:00 a.m.

152.     On August 15, 2018, the Office of the Chief Medical Examiner determined the cause of DJ's death to be "DIABETIC KETOACIDOSIS DUE TO TYPE 1 DIABETES MELLITUS."

153.     Michael Hays, MD, Assistant Chief Medical Examiner, observed, "Toxicological analysis of specimens collected at autopsy revealed betahydroxybutyric acid and acetone

(products of ketoacidosis) in the blood, with the latter also identified in the vitreous and urine. The decedent's prescribed antipsychotic (aripiprazole) was also detected at a low therapeutic level."

154. Dr. Hays further noted, "Microscopic examination of the kidneys revealed Armanni-Ebstein lesion, a histological change frequently associated with diabetic ketoacidosis. Analysis of the vitreous fluid confirmed hyperglycemia; the vitreous also showed an elevated level of urea nitrogen, consistent with complications of ketoacidosis."

155. The medical investigator found a blue bin in DJ's cell that contained an appreciable amount of brown substance believed to be bile.[12] The same substance was also found around his mouth and nose. Such indicates that DJ was vomiting in his cell.

**T. Defendants Frey, Jordan, and Kithcart failed to carry out proper security checks**

156. Regional Jail correctional officers are required to perform inmate checks twice an hour. However, there is no record that any Regional Jail correctional officer sought medical help for DJ as he vomited and undoubtedly displayed other readily discernable signs that he was gravely ill. Indeed, as noted above, R. Mizelle, MA/LNA, recorded a "late entry" stating that *she* found DJ unresponsive when she "[w]ent to do diabetic check on inmate this morning." Additionally, the Medicolegal Death Investigator Emsley recorded in the official investigation of

---

[12] In his "Death Scene Investigation Report," Patrick Emsley, a Medicolegal Death Investigator with the Office of the Chief Medical Examiner, wrote, "Atop of the bottom bunk was a blue bin that had a dark brown substance inside it, with about enough liquid to cover the surface area of the bottom of the bin." He further recorded, "He had some mildly dried brown substance on the left side of his face…." Emsley also noted, "His oral cavity and inner lips had dried brown substance on them." As noted above, the Medical Examiner also described "vomitus" emanating from DJ.

death that DJ was "last known to be seen alive the **evening** prior to discovery." (Emphasis added).

157.    Six to seven security checks were supposed to be conducted between midnight on May 14 and 4:29 a.m. on May 15.  At each security check an officer is, at a minimum, supposed to confirm signs of life – including the rise and fall of the chest or other activity – before proceeding to the next cell.  Nurse Mizelle's late entry and Investigator Emsley's notes indicate that such was not done or done with any assurance of accuracy.  Investigator Emsley also wrote that when DJ was found unresponsive at the jail, he was "supine on the floor of his cell," suggesting that he fell – with no response from correctional officers.

158.    As noted above, "Security" staff present when the Code Blue was called were Sergeant Frey, Officer Jordan, and Officer Kithcart.  These are, therefore, the correctional officers who failed to carry out, or carry out properly, the mandated security checks. Kithcart also filled out a segregation Daily Confinement Record for DJ on May 14, 2018, indicating that he was also assigned to monitor DJ on May 14.

### U.    An extremely "late" entry was added to DJ's medical record

159.    Well-after his death, DJ's CCS "Patient Profile- Summary" was updated.  Under "Problems," a "Chronic" "Psych" "Problem" of "Code F07.0," "Personality change due to known physiological condition" was entered into his chart as "observed" on July 26, 2018.

## VII.    ADDITIONAL FAILINGS OF THE REGIONAL JAIL AUTHORITY AND CCS

### A.    The Regional Jail Authority

160.    For about twenty years, there has been documented history of jail experts stating that the Regional Jail does not have sufficient officers and support staff to handle or secure its inmate population.  The Virginia Board of Corrections has determined in state studies from 1999

forward that the Regional Jail does not have adequate staff.  The Department's last study, conducted in 2017, found that 122 new positions were needed (an increase from 300 to 422 positions, or about 40% more staff). (Harki, Gary A., "While mired in investigations and death, Hampton Roads Regional Jail's board fought against change," *The Virginian-Pilot*, April 11, 2019; hereinafter "*Pilot*, April 11, 2019").

161.    The U.S. Justice Department informed the Regional Jail Authority in 2017 during its investigation that the jail was insufficiently staffed to provide for its population.  *Pilot*, April 11, 2019.

162.    *The Virginian-Pilot* determined through a review of state data that the Regional Jail has more inmates with the acute psychiatric diagnoses of schizophrenia and bipolar disorder than any other Virginia jail.  The paper found that the Regional Jail also has more inmates who are taking anti-psychotic medications than any other Virginia jail.  However, the Regional Jail has a disproportionately low amount of staff: the Regional Jail has fewer staff per inmate than all five of the city jails that send their sickest inmates to the Regional Jail. *Pilot*, April 11, 2019.

163.    Former Regional Jail Superintendent Ronaldo Myers, who was hired in March 2017 and resigned in March 2018, tried to get each city member of the Regional Jail to largely increase its funding to the regional jail.  Myers was hired while the Department of Justice investigation was up and running.  In 2017, he also cautioned the Regional Jail finance committee that the Regional Jail was dangerous – for both inmates and guards – due to insufficient staffing. *Pilot*, April 11, 2019.  Myers warned, in both Regional Jail board and finance committee meetings in 2017, that the jail required more than 100 more positions.  He said at least 50 of those positions were critical to safe operations.  *Pilot*, April 11, 2019.

164.    However, instead of supporting Myers and heeding his suggestions, the Regional Jail Authority decided to focus on chastising him for using overtime to provide coverage at the Regional Jail, and purportedly not filling positions quickly enough, despite the Regional Jail's problem with turnover. *Pilot*, April 11, 2019.

165.    The Regional Jail Authority put pressure on the Regional Jail to control costs while also asking it to take not only the sickest inmates from member jails, but to take them as quickly as possible.  In Summer 2017, the Hampton Sheriff sent a paralyzed inmate to the Regional Jail without previously notifying the facility of his condition.  Board members were angry when Myers then decided to enforce a previously unenforced rule requiring member cities to keep inmates for at least 14 days prior to transferring them to the Regional Jail.  Enforcement of the rule would help control the Regional Jail's costs.  There are often heightened costs during the early days of an inmate's incarceration due to increased court appearances at that time and the resulting transportation needs.  However, among others, the Hampton Sheriff and the Norfolk Sheriff's Office were upset at the move because it pushed costs back on their cities.  Norfolk, for example, would have to spend thousands on additional HIV medications alone due to the enforcement. *Pilot*, April 11, 2019.

166.    Notwithstanding wanting the Regional Jail to take on so many sick persons, the Regional Jail Authority gave the Regional Jail a 2018 budget far less (about 45 % less) than what then-Superintendent Myers stated he needed.  The budget also did not provide any money for additional staff. *Pilot*, April 11, 2019.  But the Regional Jail Authority was also upset when Myers attempted to get funding through the Virginia General Assembly (an attempt that ended up not being successful).  The Regional Jail Authority also blamed Myers for the Regional Jail's staffing issues. *Id*.

60

167.     The jails in each of the member cities that make up the Regional Jail Authority

(Chesapeake, Hampton, Newport News, Norfolk, and Portsmouth) and that send inmates to the

Regional Jail all have more correctional officers and support staff per inmate than does the

Regional Jail.  *Pilot*, April 11, 2019.

168.     Former Superintendent Myers resigned in March of 2018.  He was replaced by

Interim Superintendent Defendant Hackworth, who until then had been Chief Deputy of the

Sheriff's Office in member city Chesapeake.  Myers reportedly told *The Virginian-Pilot*:

> I really don't think the board knows what it's created in the regional jail.
> It is basically a mental health and medical hospital. … I believe that's what it was
> designed for. I think they believed that if they consolidated everything into one, it would
> be better. But you have to understand, once you consolidate, you have to pay for it.

> *Pilot*, April 11, 2019.

169.     The contract between the Regional Jail Authority and CCS that was signed when

CCS became the Regional Jail's medical contractor (and that was subsequently renewed) also

indicates that an "appropriate HRRJ and/or security representative" was a member of the

healthcare Continuous Quality Improvement committee at the Regional Jail.[13]  It provides for

daily narrative reports to the Regional Jail that include medical incident report copies.  Monthly

reports "concerning the overall operation of the health services rendered...and the general health

of the inmate population of the Facility" were also required.  These included, among other

things, inmates seen at sick call, inmates seen by physician, and inmate mortality.  Defendant

Hackworth, as well as Bryant, who was the Assistant Superintendent from October 2016 until

---

[13]  The Regional Jail's "Medical Services" policy also specifically mentions the
"Superintendent" as recipient of the compliance reports of the Continuous Quality Improvement
committee.

shortly after DJ's death, were well aware of the Regional Jail's failings and that DJ and persons like him were at risk of serious harm.

**B.     CCS**

170.     With regard to Defendants Medical Director Moreno, Director of Nursing Barton, Health Services Administrator Green, and Mental Health Director Determan, information from CCS's contract with the Regional Jail Authority and recent significant events also show how they would certainly have been aware of DJ and his serious medical conditions that were not being properly treated, and also aware that inmates similarly situated as DJ were not receiving proper care.

171.     First, as noted herein, CCS became the Regional Jail's healthcare contractor very soon after the high-profile death of Jamycheal Mitchell, a mentally ill inmate.  Thereafter, at least two state agencies (Department of Behavioral Health and Developmental Services (DBHDS) and the Office of the State Inspector General (OSIG)) were investigating Mitchell's death, including conducting interviews of  Regional Jail personnel.  Then, inmates Thrower and Stewart both died at the Regional Jail while CCS was the provider.  Additional death and significant injury followed as chronicled herein. The United States Department of Justice began investigating the jail and meeting with and interviewing jail and medical personnel.  The investigation was ongoing when DJ died.

172.     Further, the Regional Jail Authority's Request for Proposals RFP # 000146 for a new healthcare provider issued August 21, 2015, which proposal CCS answered to become the Regional Jail's medical contractor and which is referred to in the contract between CCS and the Regional Jail Authority,[14] states, among other things, that the Director of Nursing:

---

[14]  The December 1, 2015 contract between CCS and the Regional Jail Authority states that "CCS shall manage comprehensive institutional health care services for the Facility according to the terms and provisions of the Request for Proposal 000146, attachments to the

shall function in a clinical capacity for at least four (4) hours per work day and administratively for the remainder. It is expected the D.O.N. will be actively on the floor monitoring all components of the clinical operation and ensuring staff are fulfilling their responsibilities and duties. The D.O.N. shall be responsible with the H.S.A. for staffing schedules; however, the D.O.N. will not be used primarily to administratively schedule the nursing staff. The D.O.N. will provide clinical coverage and operational oversight. It is expected the D.O.N. will manage by touring the clinical operations.

173.     The Request for Proposals also states that the Health Services Administrator "shall be the initial point of contact for HRRJ Administration." "It is expected that the H.S.A. will be primarily focused on running HRRJ's comprehensive inmate health services program and not become overly extended in completing corporate calls or reporting activities." The HSA, the Request for Proposals makes clear, "will manage by regularly walking around all areas of the health services operation and be familiar with all operations."

174.     In her position as DON, therefore, Defendant Barton spent at least half of her work day performing clinical nursing activities such as seeing and treating patients and providing "clinical coverage." Her position was specifically not just an administrative position and scheduling was not her main activity. She also did not work isolated in an office, but "actively on the floor," where she could not only see the activities of staff, but "manage" them and "ensure[]" that staff were doing their jobs. She specifically moved around and "toured" the various areas of clinical operation. Barton was responsible for overall "monitoring" of "all components of the clinical operation." In her position as HSA, Defendant Green also had familiarity with "all operations" of the Regional Jail's healthcare system, and actually physically visited all areas where healthcare was executed on a "regular[]" basis. It was her job to "run[]" the Regional Jail's health services programs. She was the "initial" CCS contact for the Regional

_____

RFP, addenda #1-#4 of the RFP, the Proposal Response submitted by CCS to the RFP and this Agreement." The contract was subsequently renewed in February 2017.

Jail administration as well.  As a result of these activities, Barton and Green had considerable knowledge of the ways in which healthcare was administered (and not administered) at the Regional Jail.  However, they did not seek to correct clear barriers to care.

175.   The Request for Proposals RFP # 000146 further provides, "It is also a requirement of this contract that the medical director, H.S.A., DON, infirmary RD, and PhD mental health director meet each weekday morning to discuss significant care needs and hospitalizations."

a.   This requirement of daily meetings between Medical Director Moreno, Director of Nursing Barton, Health Services Administrator Green, and Mental Health Director Determan underscores that their individual knowledge of the Regional Jail's faulty health care administration system and the risks to inmates with serious medical conditions was amplified by their regular collective dialogue about their experiences, work and observations.

b.   Given that DJ was recognized by CCS as having diabetes Type 1 and schizophrenia, had been in and out of the Regional Jail and other facilities where CCS was the medical contractor for several months, had then been recently hospitalized on a TDO at Eastern State, and was placed in segregation at the Regional Jail due to his condition, Director of Nursing Barton, Health Services Administrator Green, Medical Director Moreno and Mental Health Director Determan also would have known of DJ and his needs.

c.   Indeed, when DJ had been previously transferred to the Regional Jail (February 21, 2018), Determan drafted a "Mental Health Progress Note," concerning DJ and his transfer. Determan's record prominently noted DJ's "Chronic" Endocrine "Problem," which was characterized as "Type 1 diabetes mellites with ketoacidosis without coma." ¶ 50.  She also led, or participated in, a conference call concerning DJ's "medical and mental history and current

64

presentation." *Id.*  The next day, Determan e-signed a medical entry noting that DJ was "hearing

voices, pts mood flipping from calm to hostile, refusing medical attention." ¶ 52.  DJ was shortly

thereafter sent to ESH on a TDO; he would be *again* transferred to ESH from the Regional Jail

on another TDO only about five weeks later.  Dr. Moreno had prescribed medications for DJ for

Diabetes Type 1 in February, March and April 2018. ¶¶ 102-104, 106.  Director of Nursing

Barton, Health Services Administrator Green, Medical Director Moreno, and Mental Health

Director Determan were also all working when DJ was brought back to the Regional Jail in an

urgent state after his court hearing on May 14, 2018, and were in charge of the medical and

mental health operations that DJ encountered from then on.  Green was specifically mentioned in

the records of Norfolk Jail CCS personnel from May 14, 2018. ¶¶ 134-135.

    d.  However, these providers simply were indifferent to DJ and his

circumstances despite apparent daily meetings specifically designed to help DJ and other inmates

with significant care needs.

    e.  Moreover, DJ had been prescribed life-essential diabetes medication by

Dr. Moreno that nursing records clearly indicate was not being taken as prescribed in May 2018.

    f.  DJ also received an alert for mental health treatment by nursing that was

never properly addressed.

    g.  DJ further was a known schizophrenic who was not receiving

mental health medication at the Regional Jail.  Abilify, a mental health drug, was prescribed for

DJ for receipt on or about May 1, 2018.  However, per records, he never received it. Thereafter,

no mental health medication was prescribed or received. DJ was purported to be "refusing"

mental health medication and treatment, despite his recent TDO and the Regional Jail course

indicating that he was not capable of informed refusal.

       h.     And he was experiencing aggravation of his condition at the jail such that he was put in segregation.

       i.     These providers had to have known about these conditions because their Departments were all intimately involved in DJ's non-care and their duties required them to interact with DJ's records.

176.    The Request for Proposals RFP # 000146 also states that the health contractor (CCS):

> shall maintain a comprehensive CQI [Continuous Quality Improvement] program in accordance with professional standards.  The multi-disciplinary committee will consist of the Medical Director, Psychologist, Dentist, HSA, DON, Contract Monitor, and appropriate HRRJ and/or security representative.  All other MSC [Medical Services Contractor] staff will participate in CQIP on a rotating or as needed basis.  There will be bi-monthly CQIP meetings with monthly studies. Either the DON or HSA will act as coordinator for each meeting.  The Contract Monitor will review the program on a quarterly basis and make recommendations as necessary.  CQIP studies of interest may be required by HRRJ regardless of the MSC [Medical Services Contractor]'s CQI schedule."

177.    Moreover, according to the contract document itself, the Continuous Quality Improvement program was to be instituted by CCS and "monitor the health services provided to the inmate population of the Facility, including peer reviews and audit and medical chart review procedures to ensure compliance with this Agreement, as well as NCCHC and ACA standards." Given their involvement in such programs, Moreno, Barton, Green and Determan could not have failed to know of the numerous barriers to proper medical care plaguing the jail.

178.    Notwithstanding the foregoing, and their roles of authority and knowledge of the problems, Moreno, Barton, Green and Determan did not adequately address the continuous and obvious risk of harm to inmates like DJ with serious medical needs.

## VIII.   THE DEFENDANTS OWED DUTIES TO DJ, BUT BREACHED THOSE DUTIES

### A.   Defendants Owed DJ Duties

179.   At all times while DJ was detained[15] at the Regional Jail until May 15, 2018, when he was declared dead at the Regional Jail, DJ was in the custody and under the care of the Jail Authority Defendants, the CCS Defendants, and the Correctional Officer Defendants, and their employees/agents.  When DJ was transported to and from court on May 14, 2018, DJ was in the custody of Sheriff Baron, and his deputies/employees/agents.

180.   As discussed herein, the Defendants owed duties to DJ.  Among these duties, Defendants, and each of them, had statutory and common law duties of care to DJ, including affirmative duties to provide adequate medical care or access to adequate medical care.

181.   At all relevant times herein, Defendants, and each of them, also had duties to DJ, a pretrial detainee, pursuant to the Fourteenth Amendment of the U.S. Constitution.

182.   Pursuant to state statute, Defendant Hackworth, the Interim Superintendent of the Regional Jail, was responsible for the day-to-day operations and maintenance at the Regional Jail, and had the duty of care and custody for DJ while he was detained at the Regional Jail.  Va. Code § 53.1-95.8, incorporating by reference Va. Code §§ 53.1-116 et seq. and 15.2-1609.

183.   Defendants Regional Jail Authority, Hackworth and Baron, by and through their deputies, agents and employees, including CCS, had specific statutory duties to provide, or provide access to, medical treatment to DJ under Va. Code § 53.1-126.  Under that statute, the foregoing Defendants had a specific responsibility to inmates/detainees, in that "medical

---

[15]  As noted above, DJ was being held at the Regional Jail as a detainee; no adjudication was ever made of any criminal conduct by DJ stemming from his arrest.

treatment shall not be withheld for any communicable diseases, serious medical needs, or life threatening conditions." *Id.*

184.   Moreover, Virginia legislative authority also enabled various regulations, including, but not limited to, those requiring that 24-hour emergency medical care be made available to inmates.  Va. Code §§ 53.1-68, 53.1-95.2; 6 VAC 15-40-360.

185.   Furthermore, the Virginia Board of Corrections has an entire chapter of administrative regulations dedicated to Minimum Standards for Jail and Lockups.

186.   The second regulation, directly following the definitions for the chapter, is regulation 6 VAC 15-40-20, entitled "Responsibility."  It plainly states, "The primary responsibility for application of these standards shall be with the sheriff or chief executive officer of the jail or lockup."

187.   Closely following this regulation is 6 VAC 15-40-50, "Chief executive officer," which mandates, "Written policy shall provide that each facility shall be headed by a single chief executive officer to whom all employees and functional units are responsible."

188.   The Virginia Code further emphasizes the responsibilities of sheriffs and jail superintendents for jail management by providing that the State Board of Corrections can sue a local sheriff or superintendent for not fulfilling his jail operations duties: "If any sheriff or jail superintendent through his default or neglect fails to comply with the requirements of the Board in the operation and management of any jail under his control or management, the Board shall file a complaint with the circuit court of the county or city in which such jail is located…" *See* Va. Code § 53.1-125.  This provision continues by stating that if the court finds that the Board's claim has merit, it can order the State Compensation Board "to withhold approval of the payment

of any further salary to the sheriff or jail superintendent until there has been compliance with specified requirements of the Board." *Id.*

189.　Accordingly, Defendant Sheriff Baron was responsible for operations of the Norfolk Sheriff's Office and was the chief executive officer with direct control over his office, and, therefore, he had the ability, personally, or through his staff, to implement and modify such operations to protect jail inmates/detainees in his custody.

190.　In connection with Plaintiff's state law claims, Defendants Regional Jail Authority, CCS, and Baron, and each of them, are accountable, under the doctrine of *respondeat superior* liability, for the actions and inactions of their deputies, employees, and agents, including, but not limited to, Defendants hereto.

191.　All Defendants owed duties to DJ to exercise reasonable care in providing him, and/or in providing him timely access to, medical care, nursing care, professional, and/or correctional services during the time period of his detention/incarceration at the Regional Jail, and/or while in the custody of Defendant Baron/his deputies.

192.　Defendants CCS; Moreno, MD; Barton, RN; Green, HSA; Determan, MHD; Shah, MD; Parker, Mental Health Professional, and other CCS employees who encountered DJ had duties to render that degree of knowledge, skill, diligence and care to DJ that is rendered by a reasonably prudent health care provider or similar professional in the Commonwealth.

193.　At all relevant times herein, the final policymaking decision maker for the Regional Jail Authority in the daily operation of the Regional Jail was Defendant Regional Jail Authority itself or Defendant Hackworth. *See* Va. Code Ann. § 53-1-106(A), and *Thornhill v. Aylor*, No. 3:15-CV-00024, 2016 WL 8737358 (W.D. Va. Feb. 19, 2016).  At all relevant times

herein, the final policymaking decision maker for CCS in the daily provision of medical services

at the Regional Jail was Moreno, MD; Barton, RN; Green, HSA; or Determan, MHD.

### B. Defendants breached duties owed to DJ; Defendants' conduct and omissions violated clearly established statutory and Constitutional rights of which Defendants knew

194.    Notwithstanding the duties described above, the Defendants, individually, and/or

through their agents and employees, and each of them, breached the duties they owed to DJ, and

were negligent, grossly negligent, willfully and wantonly negligent, and/or deliberately

indifferent to DJ's care and needs.

195.    The CCS Defendants were keenly aware of the need for mental health

professionals to communicate promptly and clearly with medical professionals, and vice versa,

concerning the status of inmates/detainees in their care.  Just as in the Jamycheal Mitchell case

discussed below, continuity of care breakdowns continued at the Regional Jail, resulting in DJ's

death.  In addition to failing to coordinate care, the CCS Defendants failed to conduct proper

examinations, failed to make an accurate diagnosis of diabetic ketoacidosis, failed to keep proper

records, failed to report up the chain of command effectively, failed to form and carry out an

effective treatment plan with regard to DJ, and failed to devise an effective method for the

administration of DJ's medications.  Records indicate that DJ was not provided access to a

physician when his condition worsened on May 14, 2018 and at other times.

196.    As more fully discussed below, the CCS Defendants and the Jail Authority

Defendants were aware that the Regional Jail had become the subject of federal and local

investigations concerning the failure to provide adequate medical and mental health care to

inmates and detainees.  There could have been no greater issue for the CCS and the Jail

Authority Defendants to address than the foregoing failures.  However, DJ's case mirrored the

70

tragic death of Jamycheal Mitchell – non-taking/purported refusal of antipsychotic medications followed by/accompanying mental decompensation and then non-taking/ purported refusal of other medications and physical decline.

197.    The Correctional Officer Defendants failed to respond, or responded with deliberate indifference, to DJ's deteriorating medical situation.

198.    Defendant Baron and his deputies/employees/agents were aware that the Court on May 14, 2018 had ordered that DJ was to be promptly provided medical care; however, they did not provide DJ with help.

199.    Defendants breached their express duties as set forth in the statutes, rules, policies, and procedures applicable to the Defendants.  Among other provisions, Defendants failed to comply with Section 53.1-126 of the Code of Virginia, which states that, with regard to detainees/inmates, "…medical treatment shall not be withheld for any … serious medical needs, or life threatening conditions."

200.    Thus, the Defendants violated: an express directive by the Virginia General Assembly to provide medical treatment for all serious medical needs or life-threatening conditions; the U.S. Constitution; as well as their individual expressed duties and responsibilities, in failing to provide DJ with adequate medical care, and/or access to adequate medical care.

201.    Defendants' actions and omissions, in denying obvious and necessary care and attention to DJ, rose to the level of deliberate indifference to serious medical needs. Additionally, the several acts of negligence of individual defendants, when combined, had a cumulative effect showing a reckless or total disregard of DJ and his acute medical condition.

202.    Defendants' specific breaches of duties include the following:

a. **All Defendants**

1. In or about May 2018, the Defendants in this matter failed to provide DJ urgently needed medical care and/or access to that care.

b. **Defendants CCS; Moreno, MD; Barton, RN, DON; Green, HSA; and Determan, Mental Health Director**

1. Failed to implement a system whereby inmate failures to receive life-sustaining medications were promptly and properly acted upon.

2. Failed to implement a system whereby inmate serious medical needs were promptly and properly acted upon.

3. Tolerated, or otherwise failed to correct a system that did nothing in the face of inmate failures to receive life-sustaining medications.

4. Failed to have systems in place to alert providers and prompt action when an inmate/detainee was not taking life-sustaining medications or when mentally decompensating.

5. Failed to implement a system that provided adequate monitoring and coordination of care for acutely at-risk inmates.

6. Ignored DJ despite his non-taking of life-saving medications and his return to the jail after suffering an acute medical episode at court.

7. Failed to seek a TDO for DJ, or otherwise arrange for his transportation to Eastern State Hospital or comparable facility. Previous times when DJ had not taken his medication, healthcare providers, including CCS staff, had requested/obtained temporary detention orders (TDOs) which transferred DJ to appropriate facilities (ESH, Riverside) to become medication compliant. However, despite their awareness of DJ's mental and physical decline, these Medical Department leaders failed to seek a TDO for DJ in May 2018.

8. Failed to have systems in place to support proper examination, assessment, diagnosis, treatment, monitoring and care of DJ, including referral of DJ to a hospital / the calling of 911.

9. In or about May 2018, failed to provide DJ urgently needed medical care and access to that care.

10. Were fully aware that DJ, who suffered from schizophrenia and bipolar disorder and had been subject to at least eight psychiatric admissions and multiple TDOs, ***had not taken antipsychotic***

***medications, nor received adequate insulin for more than two weeks.*** As a Type 1 diabetic, DJ's failure to receive diabetes medication as prescribed was exceedingly dangerous.  As noted above, in Type 1 diabetes, the body ***does not produce insulin***. However, did not act to appropriately help DJ.

11. When medication administration was documented, on almost all occasions, the mentally impaired DJ was said to have "refused" his medication, or otherwise to have not ingested it.  However, DJ was unable to conscientiously refuse. Additionally, in all or nearly all such circumstances, there is no documented contemporaneous notification of a physician or nurse practitioner that DJ was not receiving his medication and there is no follow up by providers. Because of their administrative duties, these Defendants could not have failed to know about this significant breakdown in documentation and communication by *their* departments.  They could not have failed to have known that there were significant problems with medication administration, particularly with regard to mentally ill persons at the Regional Jail. Because of their medical backgrounds, they also could not have failed to know the danger to DJ and others like him in not receiving medication.  But they failed to correct these dire circumstances in their departments.

12. Ignored, or dismissed without basis, DJ's obvious serious medical condition and risk for additional harm.

13. Despite awareness of DJ's serious condition, failed to call 911 or otherwise send DJ to the hospital.

14. Failed to monitor adequately DJ's condition.

**c.  Defendants CCS and Moreno, MD**

1. Failed to respond to DJ's emergent circumstances when DJ was returned to the Regional Jail on May 14, 2018 for medical treatment.

2. For no clear or explained reasons, prematurely halted Lantus U-100 Insulin (Insulin Glargine) 100 unit/mL subcutaneous solution.  None was ordered after May 11, 2018.

3. As Medical Director, Defendant Moreno, MD, had a responsibility to coordinate care, including ensuring that he and other medical providers communicated among themselves and also with mental health care providers and had a coordinated treatment plan concerning DJ.  DJ was clearly at at-risk inmate, with two significant conditions, one mental health and one medical, and a history of deterioration.

However, there is nothing in the records received pre-litigation indicating that Moreno addressed DJ's supposed "refusal" or non-receipt of medications and treatments; nothing indicating that Moreno ever followed up with any mental health care provider; and nothing indicating that Moreno ever followed up after DJ was brought back to the Regional Jail from the Norfolk court.

4. Additionally, despite his authority and duties as Medical Director, there is nothing indicating that Defendant Moreno, MD, ever sought a TDO, or ever called Eastern State Hospital about a TDO, or took any other actions, which would have afforded DJ access to proper medical and mental health treatment. Instead, Defendant Moreno, MD, despite certainly being aware of DJ's state, and serving as the Medical Director, did not do anything for DJ as his condition worsened.

5. Moreno overall knew of the vast failures in healthcare delivery at the Regional Jail cited by DOJ in their report.  This includes failure to provide adequate intake, discharge planning, sick call, chronic care, and emergency care such that prisoners are subjected to an unacceptable risk of harm due to delays or lack of treatment; systemic failures *often* causing the failure to provide an adequate level of care, including proper medication administration; inadequate mental health treatment services, including inadequate medication management; and not enough mental health professionals.  He therefore knew that DJ and persons like him with significant comorbidities, including the very dangerous condition of Diabetes Type 1, compromised self-care ability, and numerous recent TDOs were at significant risk. But he did not take appropriate steps to protect DJ.

### d.  Defendants CCS and Barton, RN, DON

1. As Director of Nursing ("DON") at the Regional Jail, Defendant Barton, RN, would have known that:

    i.   her nursing staff was not properly communicating to nurse practitioners/doctors material conditions such as DJ's alleged "refusal" of medication.

    ii.  DJ had previously been the subject of TDOs, but none had been sought for him and/or properly followed up upon in May 2018.

    iii. DJ's not receiving medication made him more vulnerable and progressively less likely to be able to communicate his needs effectively to staff.

    iv.   there was inadequate follow up after DJ returned to the Regional Jail from court on May 14.  As DON, Defendant Barton, RN, would have known of DJ's physical deterioration and distress on May 14 and her department's wrongful response.

    v.   Regional Jail medical personnel were not providing adequate care for DJ.

    vi.   there was not effective coordination of care between or among medical providers and mental health care providers at the Regional Jail.  However, these conditions were allowed to continue unchecked.

    vii.   There was not an adequate nursing plan of care for DJ.

2. Despite her duties as Director of Nursing to have systems in place to provide for effective, proper nursing care and effective auditing of such, there is no record that Defendant Barton, RN, did anything directly to intervene in DJ's case, such as conferring with nurse practitioners or doctors, meeting with nurses charged with providing care to DJ, contacting Eastern State, or otherwise improving DJ's medical care.

3. Wholly disregarded her duty to keep abreast and follow through on incidents occurring on all shifts, to ensure the practice of nursing is consistent with current standards, to be responsible for level of care, and to maintain constant contact with clinical medical services.

4. Barton overall knew of the vast failures in healthcare delivery at the Regional Jail cited by DOJ in their report.  This includes failure to provide adequate intake, discharge planning, sick call, chronic care, and emergency care such that prisoners are subjected to an unacceptable risk of harm due to delays or lack of treatment; systemic failures *often* causing the failure to provide an adequate level of care, including proper medication administration; inadequate mental health treatment services, including inadequate medication management; and not enough mental health professionals. She therefore knew that DJ and persons like him with significant comorbidities, including the very dangerous condition of Diabetes Type 1, compromised self-care ability, and numerous recent TDOs were at significant risk. But she did not take appropriate steps to protect DJ.

e. **Defendants CCS and Green, HSA**

1. As a Health Services Administrator, Defendant Green was charged with planning, directing, and coordinating medical and health services at the Regional Jail.   Defendant Green would have known that there was not effective coordination of care among providers at the Regional Jail, including among and between medical and mental health providers.

2. Defendant Green would have known that nursing staff was not properly communicating to nurse practitioners/ doctors conditions such as non-receipt or "refusal" of medication/otherwise failure to ingest medication; non-receipt or "refusal" of other treatments; mental deterioration; and physical deterioration.  She would have known that medical providers were not properly following up with DJ.

3. Defendant Green would have known that nurse practitioners, doctors, social workers, and others were not communicating effectively amongst each other.

4. Defendant Green would have known that mental health staff also were not properly assessing and treating DJ's mental health condition. This includes that an urgent nursing referral concerning DJ was not being appropriately or timely addressed by mental health and that mental health was not appropriately monitoring DJ or handling the huge risk that his mental health presented for his physical health.

5. Failed to have a plan in place to address well-known problems of an at-risk inmate.  The effect of DJ's not taking mental health medication – leading to a life-threatening inability to self-manage insulin intake- was well-known to CCS. But the HSA had no plan in place to address the known cycle.

6. Defendant Green would have known that DJ was previously subject to TDOs, but no action was being taken concerning DJ's "refusal" of life-sustaining medication.

7. As HSA, Defendant Green should have had a system in place to effectively initiate and track TDOs / whether they had been implemented, but did not.

8. As HSA, Defendant Green would have known of failures of medical and mental health providers to medically and psychologically stabilize mentally ill inmates.

76

9. Green, in addition to failing to do anything directly to improve DJ's situation, failed to facilitate coordination of care and communication among and between mental health and medical providers, failed to correct wrongful nursing practices, failed to have systems in place to properly initiate and track TDOs, failed to have systems in place to ensure that there was documented showing of medical and mental health stabilization, and otherwise failed to provide for a correctional health care system that would allow access to adequate medical and mental health treatment and monitoring to DJ and inmates like him.

10. Despite being specifically informed of DJ's acute medical conditions at court on May 14, 2018, Green did nothing in response.

11. Green overall knew of the vast failures in healthcare delivery at the Regional Jail cited by DOJ in their report.  This includes failure to provide adequate intake, discharge planning, sick call, chronic care, and emergency care such that prisoners are subjected to an unacceptable risk of harm due to delays or lack of treatment; systemic failures *often* causing the failure to provide an adequate level of care, including proper medication administration; inadequate mental health treatment services, including inadequate medication management; and not enough mental health professionals.  She therefore knew that DJ and persons like him with significant comorbidities, including the very dangerous condition of Diabetes Type 1, compromised self-care ability, and numerous recent TDOs were at significant risk. But she did not take appropriate steps to protect DJ.

### f.  Defendants CCS and Determan, MHD

1. As noted above, in advance of his February 2018 transfer to the Regional Jail – a move that was precipitated by DJ's mental health issues and medical issues (the latter characterized as "Chronic Type 1 diabetes mellites with ketoacidosis without coma") – Determan led, or participated in, a conference call with transferring jurisdictions concerning DJ's "medical and mental history and current presentation." DJ was shortly thereafter hospitalized on a TDO. Determan had known for several months that DJ was an at-risk inmate, but she did not provide him with adequate care in May 2018 when he once again presented to the Regional Jail following a second TDO hospitalization.

2. Despite her role as the Mental Health Director, which, as noted above, put her in a position of authority and of review of records, and knowledge of his condition, Defendant Determan was negligent, grossly negligent, wanton and willful in her actions, and acted with deliberate indifference to DJ's medical and mental health needs.

77

3. Determan, Mental Health Director, should have implemented and had in place systems and procedures to ensure access of inmates/detainees to adequate mental health care and proper auditing of and corrective action with regard to such systems. This includes, but is not limited to, an effective mechanism to seek and track the status of TDOs. However, she did not.

4. Failed to ensure that there was communication and coordination of care between and among DJ's Regional Jail mental health providers and medical providers. Knew that no such communication and coordination of care was occurring. Among other things, no meetings between mental health and medical providers and no coordinated treatment plans are in the record.

5. Knowing that DJ was not only acutely mentally impaired, but also physically deteriorating and not receiving prescribed medication, treatments, or adequate care at the Regional Jail, Mental Health Director Determan could and should have been calling the Community Services Board and Eastern State every day regarding DJ, the danger of keeping him at the Regional Jail, and his need for a TDO. But she did not.

6. Determan should have ensured that the May 10, 2018 urgent referral to mental health made by nursing was promptly and properly addressed.

7. Failed to have a plan in place to address well-known problems of a well-known, at-risk inmate. The effect of DJ's not taking mental health medication – leading to a life-threatening inability to self-manage insulin intake- was well-known to CCS. But the Mental Health Director had no plan in place to address the known cycle.

8. Determan overall knew of the vast failures in healthcare delivery at the Regional Jail cited by DOJ in their report. This includes failure to provide adequate intake, discharge planning, sick call, chronic care, and emergency care such that prisoners are subjected to an unacceptable risk of harm due to delays or lack of treatment; systemic failures *often* causing the failure to provide an adequate level of care, including proper medication administration; inadequate mental health treatment services, including inadequate medication management; and not enough mental health professionals. She therefore knew that DJ and persons like him with significant comorbidities, including the very dangerous condition of Diabetes Type 1, compromised self-care ability, and numerous recent TDOs were at significant risk. But she did not take appropriate steps to protect DJ.

78

### g.   Defendants CCS and Shah, MD

1.   Records indicate that Shah not only knew about DJ's schizophrenia, but also knew of DJ's diabetes diagnosis and his non-compliance with medications on previous recent incarcerations at the Regional Jail. Shah had prescribed DJ mental health medication in February 2018 (DJ was subsequently sent to ESH from the Regional Jail following not taking medication as prescribed) and in March 2018 (when DJ was sent back to the Regional Jail from ESH).  DJ's Diabetes Type 1 condition self-populated as a "problem" on forms Shah filled out, including on May 8, 2018 and previously.  As a medication prescriber, Shah also should have known the other medications that DJ was prescribed for drug interaction purposes.  Shah is also a psychiatrist, a medical doctor who knows the likely effects of a schizophrenic not taking psychotropic medication, and the further likely effects on such a person if he is also diabetic.  However, Shah failed to have a plan in place to address well-known problems of an at-risk inmate.  Shah saw DJ by telemedicine on May 8, 2018 and knew that DJ was refusing psychotropic medications and mental health treatment. The effect of DJ's not taking mental health medication – leading to a life-threatening inability to self-manage insulin intake – was well-known to CCS and Shah. But the psychiatrist seeing DJ had no plan in place to address the known cycle.  Instead, he scheduled no follow up and decided to see DJ on a "prn" or as-needed basis, including if the mentally ill DJ requested help himself.

2.   Failed to act upon receiving the May 10, 2018 urgent mental health referral from nursing indicating that DJ was "talking to other person in head," and was "locked down for homicidal thoughts and a statement of self harm" and needed to be seen.  Did not examine DJ or otherwise cause him to be examined.

3.   Failed to coordinate care with DJ's other medical providers.  As both a medical doctor and a mental health professional, he was in an excellent position to work with both mental health and medical providers to address DJ's comorbidities, but he did not.

4.   Failed to care adequately for DJ, including failing to monitor DJ for signs of deterioration and necessity of a TDO for medication compliance.

5.   Failed to properly examine DJ.

6.   Failed to monitor adequately DJ's condition.

7. Failed to properly treat DJ, or otherwise obtain proper medical assistance for him.

8. Despite records indicating that DJ was not receiving his prescribed medication for diabetes, did not do anything effective in response.

### h.  Defendants CCS and Parker, Mental Health Professional

1. On May 14, 2018 at 4:47 PM, merely "E-Signed" the "Urgent" "Staff Referral Form" from Dedra Williams, RN, dated May 10, 2018, and noting that DJ needed to be seen by mental health because he had to be locked down, expressed homicidal thoughts, made a statement of self harm, was "talking to other person in head," and had previously been put on "prn" status by the jail's psychiatrist due to treatment refusals. Did not intervene to help the acutely ill DJ.  No note indicating that she even examined DJ, much less did any intervention. Records indicate she simply disregarded DJ and signed the form to dismiss it.

2. Failed to monitor adequately DJ's condition.

3. Failed to care adequately for DJ.

4. Failed to obtain proper medical care for DJ.

5. Failed to send DJ to a hospital or to call 911.

### i.  Jail Authority Defendants (the Regional Jail Authority, Hackworth, and Bryant)

1. The OSIG Report, observed that "HRRJ has a direct responsibility to provide quality medical and mental health care for those in their custody[.]"  Indeed, the OSIG Report noted that although NaphCare is no longer the Regional Jail's healthcare contractor, "a change in provider offers limited promise of improvement in care or documentation in the absence of a change in **oversight practices.**" (Emphasis added.)  These Defendants did not fulfill their responsibilities with regard to providing medical and mental health care to inmates, including failing to engage in adequate oversight practices.

2. Knew that they had a long-standing, severe, pervasive, systemic problem with providing access to and provision of medical care to inmates/detainees for serious medical needs. This included matters noted by DOJ, such as failure to provide adequate intake, discharge planning, sick call, chronic care, and emergency care such that prisoners are subjected to an unacceptable risk of harm due to delays

or lack of treatment; systemic failures *often* causing the failure to provide an adequate level of care, including proper medication administration; inadequate mental health treatment services, including inadequate medication management; and not enough mental health professionals. Therefore knew that DJ and persons like him were at significant risk. But did not take appropriate steps to remedy such problems.

3. Knew from DOJ investigators and the previous superintendent, as well as years of history of Department of Corrections reports, that the Regional Jail was dangerously understaffed. Knew that the Regional Jail had fewer staff per inmate than its feeder cities and received the sickest inmates from each city.  Knew that pressure was put on the Regional Jail to take the sickest inmates from each city as soon as possible and funding was inadequate. However, failed to adequately address these problems.

4. Failed to obtain necessary medical care for DJ for a serious medical need.

5. Failed to send DJ to a hospital or to call 911.

6. Failed to have systems in place to support proper examination, assessment, diagnosis, treatment, monitoring and care of DJ, including referral of DJ to a hospital / the calling of 911.

7. Knew that their correctional officers were preventing inmates like DJ with serious medical conditions from having access to and receiving proper medical care despite measures such as security checks and supervisory rounds/inspections and physical head count.  Correctional officers were still failing to elevate clear emergent matters to medical or 911 promptly.  However, did not remedy the situation.

8. Knew that it was not adequately auditing the work of, nor communicating/coordinating with, its medical care contractor CCS to ensure access to and provision of medical care for serious medical needs.

9. Knew that it was not adequately seeking medical care for inmates beyond CCS. Failed to take effective measures to change this. Indeed, renewed CCS's contract.

10. As to Bryant, despite being specifically informed of DJ's acute medical conditions at court on May 14, 2018, she did nothing in response to help DJ.

81

11. Failed to have a plan in place to address well-known problems of an at-risk inmate.  The effect of DJ's not taking mental health medication – leading to a life-threatening inability to self-manage insulin intake- was well-known to the Regional Jail. He had been there several times very recently and been sent on TDOs from the facility.  But jail leaders had no plan to effectively manage his risks.

**j.  The Regional Jail Authority and Correctional Officer Defendants (Frey, Jordan, Kithcart)**

1.  Did not timely or appropriately intervene to provide DJ with access to urgently needed medical care on the evening of May 14, 2018 and the morning of May 15, 2018.

2.  Ignored DJ's open and obvious acute medical condition.

3.  Failed to inform a supervisor of DJ's acute, and open and obvious medical condition.

4.  Failed to inform the Medical Department of DJ's acute condition

5.  Failed to send DJ to a hospital or to call 911.

**k.  Defendant Baron and his deputies/employees/agents**

1.  On May 14, 2018, failed to obtain immediate medical care for DJ. The Norfolk Sheriff's Office was aware of DJ's significant health and mental health conditions.  Its records noted his Type 1 diabetes and his history of schizophrenia disorder and bipolar disorder. DJ had been held at Norfolk City Jail in February 2018 and had to be emergently hospitalized for the same condition he now had. DJ was openly and obviously ill in court on May 14, 2018 while in the custody of Baron such that the judge suspended DJ's hearing so that he could obtain treatment. But Baron and his deputies/employees/agents did not get DJ the immediate medical care that his condition required.

2.  Ignored DJ's open and obvious acute medical condition.

3.  Failed to take/send DJ to a hospital, or to call 911.

**C.  Defendants' wrongful conduct and omissions caused DJ's worsening condition and death**

203.    As a direct and proximate cause of the negligent, grossly negligent, willful and wanton, and/or deliberately indifferent actions and omissions of the Defendants, DJ's condition

worsened, he suffered great physical pain and mental anguish, and he died.  DJ's worsening condition, great physical pain and mental anguish, and death constitute constitutional injuries.

204.   As a direct and proximate cause of the negligent, grossly negligent, willful and wanton, and/or deliberately indifferent actions and omissions of the Defendants, the surviving beneficiaries of DJ have suffered, and will continue to suffer, sorrow, mental anguish, and the loss of decedent's society, companionship, comfort, guidance, kindly offices, and advice of their loved one, as well as economic losses, and have incurred hospital, doctors', and related bills, as well as funeral expenses.

## IX.   DEFENDANTS REGIONAL JAIL AUTHORITY'S AND CCS's CONSTITUTIONAL VIOLATIONS PURSUANT TO AN OFFICIAL CUSTOM, POLICY, PATTERN AND/OR PRACTICE

205.   Moreover, DJ's case is not the first instance of death and/or inadequate medical care occurring to detainees/inmates at the Regional Jail.  Rather, other lawsuits, investigations, and the local and national press have reported numerous instances of lack of medical treatment, and related deaths and catastrophic injuries of detainees/inmates at the Regional Jail.  Upon information and belief, deviations from the Regional Jail's medical policies and protocols, and other instances of negligence and abuse concerning medical care, have become commonplace at the Regional Jail.  This pattern of indifference to detainee/inmate serious medical needs, including the likelihood of continued injuries as a result, was well known to the Jail Authority Defendants, and, beginning in December 2015 when the company began contracting to provide healthcare at the Regional Jail, was well known to CCS as well.

206.   On December 19, 2018, the U.S. Department of Justice's Civil Rights Division concluded an investigation into conditions at the Regional Jail and issued a report of its findings. "Investigation of the Hampton Roads Regional Jail (Portsmouth, Virginia)" Dec. 19, 2018.

(hereinafter, "Report," attached as **Exhibit B**).  The investigation had been opened in December 2016, after, among other groups and individuals, Virginia Attorney General Mark Herring had requested that the DOJ investigate the Regional Jail.[16]  The investigation was ongoing at the time of DJ's death, and had involved multiple site visits to the Regional Jail, interviews with personnel, and comprehensive review of the Regional Jail records.

207.    According to the 2018 Report of its findings, DOJ had been "prompted to conduct an investigation of the Jail's treatment of prisoners in the wake of tragic deaths that captured local and national attention." Report p. 5.  The DOJ cited in particular the August 2015 jail death of an individual identified as "AA" and the August 2016 death of an individual identified as "BB." *Id.*  The individual described as "AA" was, per media reports and jail records, 24-year-old Jamycheal M. Mitchell.  The individual described as "BB" was, per media reports and jail records, 60-year-old Henry Clay Stewart.

208.    Like DJ, the Report describes Mitchell ("AA") as having long-suffered from mental illness.[17]  Like DJ, while mentally ill, Mitchell did not accept medications prescribed for mental health and medical reasons, as well as medical tests and visits from medical and mental health staff. Report at p. 5. Mitchell was also placed in restrictive housing. *Id.* As a result, like DJ, Mitchell suffered mental and physical "decompensation." *Id.*  The Report describes jail observations that Mitchell "displayed erratic behavior, such as screaming and talking to himself inside his cell,

---

[16]    Among other things, Herring remarked in his letter appeal to then U.S. Attorney General Loretta Lynch, "I write to you with urgency. Virginia is once again confronted with significant questions about the provision of medical care at this regional jail."

[17]    "AA had a history of bipolar disorder and schizophrenia and was determined by a forensic psychologist to be 'manic and psychotic.'" He was arrested on charges of stealing $5-worth of snacks from a convenience store. He had been court ordered to Eastern State Hospital for "competency restoration." However, he remained at the Regional Jail following errors in the transmittal/receipt and logging of the court order; the order first was not received at the hospital, and then was received, but was not entered into the hospital's wait list. Report p. 5.

snorting his medication through his nose, clogging his toilet, and smearing fecal matter on himself and the walls of his cell." *Id.* Mitchell "lost nearly 40 pounds" at the Regional Jail. He developed "bilateral extremity edema" (severe swelling of the feet and legs). Mitchell died at the jail from "heart failure as a result of rapid weight loss." *Id.* He was not assisted by jail or medical personnel until he was already unresponsive. At his death, Mitchell was still awaiting transfer to Eastern State Hospital three months after the court's competency order. *Id.*

209. Individual "BB," Henry Clay Stewart, died in August 2016, one year after Mitchell's death. The Report documents how Stewart made multiple medical grievances asking to be seen by a medical provider, but was continually rebuffed. Report p. 6. For about a month beginning on July 10, Stewart described suffering from heartburn and asked to be seen by a doctor because the abdominal pain he was experiencing was not being relieved with the medication the jail was providing him. *Id.* A response was not made to Stewart until 9 days later, when he was told he would be seen by a provider. However, Stewart was not given access to a doctor – he would not be seen by a doctor prior to his death. *Id.* Thereafter, Stewart described on July 30 that "he had not been able to keep down food for two weeks and had lost 14 pounds since the last time he was weighed." By August 1, Stewart begged to see a doctor "ASAP" due to experiencing a lot of problems with his bladder movement and bowels. On August 2, Stewart "complained that he had not used the bathroom in two weeks and had not been eating for days," and asked for help "'before its [sic] too late.'" The head nurse ignored his complaints about his stomach and wrote back that Stewart had been seen previously related to another condition. Stewart then wrote on August 4 that "he had blacked out two times in less than 24 hours and could not eat or hold down water." *Id.* Stewart's complaints were again dismissed by a nurse and he was not seen by a doctor. He would die two days after submitting

this last request for emergency medical help. *Id.* He was found to have died of a perforated ulcer; the autopsy "revealed that he had a pint of blood in his stomach at the time of his death." *Id.*

210.     In its Report, in which it also chronicled multiple site visits to the Regional Jail, DOJ concluded that there is reason to believe that the Regional Jail "fails to provide constitutionally adequate medical and mental health care to prisoners." DOJ Press Release, *"Justice Department Alleges Conditions at Hampton Roads Regional Jail Violate the Constitution and Federal Law,"* Dec. 19, 2018; Report, p. 1.  DOJ also found reasonable cause to conclude "that the Jail has engaged in a pattern or practice of resistance to rights protected by the Eighth and Fourteenth Amendments because it fails to provide prisoners with constitutionally adequate medical and mental health care…" Report at 43. Specifically, DOJ determined that the Regional Jail "fails to provide adequate intake, discharge planning, sick call, chronic care, and emergency care such that prisoners are subjected to an unacceptable risk of harm due to delays or lack of treatment." *Id.* at 1. DOJ also concluded that, "as a result of systemic failures, the Jail often fails to provide an adequate level of care, including proper medication administration." *Id.* at 13. DOJ also found that the "Jail's use of prolonged restrictive housing under current conditions, including the failure to provide adequate medical and mental health care, violates the constitutional rights of prisoners with serious mental illness." *Id.* at 1.

211.     Notably, DOJ found that "[o]fficials at the Jail have **been aware of the deficiencies in medical care for years and have failed to adequately address these deficiencies**. By disregarding the obvious risks to prisoner health and safety, officials at the Jail evince a deliberate indifference to prisoners' constitutional rights to adequate medical care." (Emphasis added)). *Id.* at 17.  DOJ observed that "Jail officials have been aware of the harm

86

caused to prisoners due to inadequate medical treatment and lack of access to care" for years before DJ's death – specifically, "at least since the 2015 death of [Jamycheal Mitchell], which attracted national attention." *Id.* at 17.

212.    In its Report, DOJ noted that although the Regional Jail switched medical providers after Jamycheal Mitchell's death (from NaphCare to CCS), "medical care under the Jail's current medical provider, CCS, has not significantly improved." *Id.* DOJ wrote that nine months after switching medical providers and one year after Jamycheal Mitchell's death, "BB [Stewart] died of a bleeding ulcer after his repeated requests for medical attention were ignored." *Id.* DOJ noted that in the Regional Jail's answer and cross-claim filed in the wrongful death suit brought by the administrators of BB's estate, the Regional Jail claims that CCS breached its service agreement with the Regional Jail Authority by "failing to provide appropriate clinically necessary medical services, sick call, on-site health care services, and offsite services and hospitalization" to the deceased prisoner prior to his death in August 2016. *Id.* DOJ noted that "though the Jail claims that the medical services provided to this prisoner prior to his death were deficient, the Jail nonetheless chose to renew CCS's contract in February 2017." *Id.*

213.    DOJ also stated that it "also has reasonable cause to believe that the Jail has engaged in **a pattern or practice of failing to provide prisoners with adequate mental health care.**" *Id.* (Emphasis added.) It specifically found that the "Jail's inadequate mental health care places prisoners with serious mental illness at **serious risk of harm**." *Id.* at 18.  (Emphasis added.) "The Jail does not provide adequate mental health treatment services to prisoners, failing to provide adequate medication management and therapy sessions." *Id.* at 21.

214.    DOJ also noted, "[t]he Jail does not have enough mental health professionals to treat the prisoners on its mental health caseload." It specifically stated, "[o]ne of the biggest

current shortfalls in the Jail's mental health staffing has been the paucity of psychiatry hours." *Id.* at 23.

215. Especially disconcerting were DOJ's comments concerning the Regional Jail's CCS psychologist/mental health director. Although not named in the Report, the relevant individual is Determan. DOJ found her to be "stretched thin, such that she is not able to perform all of her duties." *Id.* at 25. "She provided us with a list of her duties, which included 35 bulleted items, many of which were to be completed on a daily basis. Because it is not possible for her to complete all of these tasks by herself, some of them have fallen by the wayside and expose prisoners to the substantial risk of harm." *Id.*

216. The DOJ Report observed that the "death of [Jamycheal Mitchell] in August 2015 put Jail officials on notice that systemic inadequacies in its mental health system, including inadequate psychotherapy and medication administration, posed substantial risks of serious harm to prisoners. Yet the Jail has failed to take steps to eliminate these risks, evincing deliberate indifference to prisoner health and safety." *Id.* at 26.[18]

---

[18] Prior to the DOJ investigation, other investigations had been conducted as a result of Jamycheal Mitchell's death. The Virginia Department of Behavioral Health and Developmental Services (DBHDS) Office of Internal Audit reportedly began its investigation on September 1, 2015 and released its report on March 16, 2016. The Office of the State Inspector General ("OSIG") reportedly began its investigation on August 24, 2015. The OSIG Report was released on April 5, 2016. For its investigation, the DBHDS interviewed, among other Regional Jail personnel, Internal Affairs head Sgt. Pamela Ellis. The OSIG Report underscored the endemic nature of Regional Jail personnel indifference to inmate/detainee care. OSIG noted that despite the Regional Jail's retention of CCS as the Regional Jail's healthcare contractor to replace its previous contractor, "a change in provider offers limited promise of improvement in care or documentation in the absence of a change in **oversight practices.**" (Emphasis added.) The OSIG Report is available at http://dlcv.org/wp-content/uploads/2016/04/OSIG-Report-2016-BHDS-002-Investigation-Critical-Incident-Hampton-Roads-Regional-Jail-04-05-16.pdf . The DBHDS Report is available at https://localtvwtkr.files.wordpress.com/2016/04/mitchell-death-report.pdf

217.    Beyond Mr. Jamycheal Mitchell and Mr. Stewart's tragic circumstances, evidence of indifference towards inmate/detainee serious medical needs at the Regional Jail was widespread prior to DJ's incarceration.

218.    For instance, it was reported by the *Virginian-Pilot* that the federal agency Immigration and Customs Enforcement (ICE) had pulled all of its detainees out of the Regional Jail back in 2014.

a.    An ICE public affairs officer reportedly stated to the *Virginian-Pilot* that "Detention facilities used by ICE must comply with the ICE National Detention Standards, which ensure that detainees in ICE custody reside in safe, secure and humane environments. ICE discontinued its relationship with the Hampton Roads Regional Jail in March 2014 because it could not verify the facility's compliance with the National Detention Standards."

b.    ICE had reportedly overhauled its national standards in 2008, following several detainee deaths, including a disturbing one at the Regional Jail where ICE detainee **Sandra Kenley** had been allowed to hemorrhage uncontrollably and denied medications prior to her death in December 2005.

c.    Kenley's sister, June Everett, reportedly testified at a 2007 congressional hearing on ICE detainee deaths about her sister's conditions at the Regional Jail as follows: "No medicine for her high blood pressure, no medical treatment for her heavy bleeding, no legal help. Even though she was afraid of retaliation, my sister did everything she could to get help also. She was hemorrhaging non-stop. Blood poured down her legs and spilled on the floor of her cell. My sister was scared, and suffering unnecessarily. But no one would do anything."

d.    According to the *Pilot*'s reporting, while Ms. Kenley was confined at the Regional Jail, she wrote to her sister, "They supposed to get my regular medicine that I haven't

gotten yet," she wrote. "My pressure was 186 over 120. … I am bearly [sic] living … trying to hold on until you get a lawyer to help me."  When Ms. Kenley passed out facedown in her cell on the day of her death, it reportedly took 20 minutes for jail staff to respond to her cellmate's calls for help.

        e.     Also in 2007, the American Bar Association apparently found that "there appear to be delays in responding to non-emergency sick call requests" at the Regional Jail. After ICE started implementing its new standards, in 2008, Human Rights Watch reportedly submitted findings of problems with administration of medication at the Regional Jail to the House Judiciary Committee's Subcommittee on Immigration, Citizenship, Refugees, Border Security and International Law.  One inmate reportedly mentioned in Human Rights Watch's submission kept a diary of his receipt of AIDs medication; it was reported that he received the correct dose only 65 percent of the time, and that he commented "There seemed to be no system for giving us the AIDS drugs."

        f.     In 2010, ICE reportedly conducted a review of the Regional Jail and found twelve deficiencies, including "communication and health care," and two physicians who did not have current certification; another review in 2012 apparently found nine deficiencies.

        g.     As noted above, the Regional Jail had never complied with the standards according to ICE, so the agency stopped housing its detainees there in 2014.

        h.     According to the *Pilot*, the decision to remove all detainees was rare, as ICE still uses about 82% of the facilities it has used for long-term detention since August 2011.

    219.    In April 2015, according to reporting by the *Richmond Times-Dispatch*, an inmate named **Alton Cowins** died at the Regional Jail of a perforated intestine.  Mr. Cowins, who reportedly was being detained on charges of trespassing and concealing or altering the price of

merchandise, appeared to be suffering from mental health conditions.  The *Times-Dispatch* reported that court records describe Cowins chanting and pantomiming swimming on the floor of his cell. Although Mr. Cowins's court-appointed attorney reportedly moved for mental competency and psychological evaluations of Mr. Cowins, he never underwent them.  Instead, when a provider went to the Regional Jail to evaluate Cowins, he was told that Cowins had died six days previously.  The *Times-Dispatch* further reported that a physician and medical director whom they interviewed described perforated intestines as "serious medical emergencies that should be detectable."  The physician also stated that the condition is "treatable with surgery in a hospital."

220.    Regional Jail inmate **Mark Goodrum** died on November 13, 2015.  Mr. Goodrum was a 60-year-old man reportedly facing a misdemeanor charge for smoking marijuana in his own home and jailed due to inability to pay a small bond.  He reportedly died of renal disease.  A friend interviewed by *The Huffington Post* following Goodrum's death reportedly said that despite existing medical conditions, Goodrum "was all right until he got locked up. When he got locked up, he died."

221.    Regional Jail inmate **Carlton Dillard** reportedly filed nine different emergency grievance forms in January 2016 for medical problems at the Regional Jail, but all of them were rejected.  *The Virginian-Pilot* wrote that Dillard's partner produced the nine grievances to the paper, which published the grievances.  In the same article, president of the Portsmouth chapter of the NAACP, James Boyd, stated that Dillard has had his cancer medication mixed up with another inmate's medicine at the Regional Jail, and is not getting the chemotherapy he needs. Among the emergency grievances by Dillard that were rejected were ones describing very serious medical conditions:

Dillard grievance dated January 5, 2016:

"My cellmate had to get me up from choking on my blood this morning." "Haven't eaten because it keeps coming up. I need to see the doctor A.S.A.P."

Dillard grievance dated January 14, 2016:

"I keep throwing up blood every time I eat anything." [According to the *Pilot*, Dillard also wrote that he was supposed to see a doctor the day before, but he did not].

Dillard grievance dated January 30, 2016:

"I'm suppose to take a pill 4 times daily every six hours, and the only nurse that have had it on the cart is the morning nurse. I need to have my medicine. I don't know why my med are not issued as prescribed. This is a matter of me not throwing up blood when I'm asleep at night or in the morning after breakfast. I need my meds A.S.A.P."

Dillard's partner additionally told the *Pilot* that he calls her every day and tells her he is throwing up and urinating blood at the Regional Jail.

222.   On March 20, 2016, **William Otis Thrower, Sr.** was pronounced dead by EMS after being found not breathing and without a pulse while incarcerated at the Regional Jail. His cause of death was found to be "Acute gallstone pancreatitis with hypertensive atherosclerotic cardiovascular disease contributing." Thrower was also denied emergency medical care at the Regional Jail, including shortly before he died, notwithstanding making multiple requests in writing and verbally.

a.   In a February 7, 2016 emergency grievance, Thrower wrote that he was experiencing sharp pains and could not sleep, and he implored Regional Jail staff, "Please help me." However, a nurse rebuffed Thrower's request for emergency care, writing under the part of the form designated "Determined not to be an emergency" that Thrower's concerns should be addressed later in "sick call." However, Thrower was never examined in sick call or otherwise in connection with this request.

92

b.      Thereafter, a physician seeing Thrower on March 11, 2016 for follow up concerning his chronic health condition of hypertension noted that Thrower's abdominal exam was "normal."  The physician made his finding notwithstanding Thrower's untreated complaints of "Very Sharp Stomach Pains. Cant Eat or Sleep.  Been Up for three Days" dating back to February, and his death nine days later involving gastric disease and the presence of a severely inflamed gallbladder and gallstones.  The physician either did not truly examine Thrower's abdomen at all or knowingly performed a woefully negligent exam.

c.      A second emergency grievance was then filed by Thrower on March 19, 2016, the day before he died.  Thrower's grievance states, "I have been unable to sleep for four days because my stomach… as of right now I haven't been able to Sh*t!  I am in Real bad pain! Help me Please!" Instead of allowing Medical to process the complaints as a potential emergency grievance, however, a correctional officer Unit Manager and Sergeant took it upon herself, as a non-medical provider, to proclaim that Thrower's condition was not an emergency, did not need immediate medical review or care, and should be removed from the emergency grievance system.  Apparently because she did not like Thrower's choice of words ("sh*t" in context for "to defecate," not used as an expletive),[19] the Sergeant marked on the form that it did not meet the definition of an emergency grievance.  She also entered it into the Regional Jail's computer database for grievances as a "Non Emergency" and marked that the grievance had been "returned" to Thrower.  The Sergeant then put Thrower's grievance in a "box/crate" where *non-emergency* paper requests for Medical were placed.  She did not explain to Medical that she had done so, notwithstanding marking that the form had been "returned" to Thrower and indicating

---

[19]  The Sergeant wrote, "You do not use profanity on documents. Resubmit as a sick call" on the form next to where she marked "did not meet definition of an emergency grievance."

in the database that it had already been decided to be "Non Emergency."  The Regional Jail had a

problematic system for requesting medical care in which, among other things, non-grievance

entreaties (paper sick call requests and electronic kiosk requests) were not timely or

appropriately administered, *causing inmates to effectively rely solely on emergency medical*

*grievances to try to get access to medical help*.  The Sergeant's decision made it *even less likely*

that Thrower would receive access to timely, appropriate medical care under the Regional Jail's

broken medical system than if the complaints had remained in a true emergency grievance.  The

relegated grievance-turned-sick call request was never answered by CCS but sat in the box for

more than 24 hours before Thrower's death.

223.    Thrower made another emergent plea for medical care on March 19, 2016, on a

CCS "Healthcare Request" form.  His form states, "Can't Pass my Bowels it's been four days.  I

am in red̶ Real Bad pain."  No response to Thrower was made at all by CCS, and there is no

record that he was examined in response to this plea.  This request would also be in CCS's

custody for a considerable period of time before Thrower's death.

224.    Thereafter, according to a Regional Jail Sergeant, a CCS licensed practical nurse

(LPN) saw Thrower during pill pass on the evening of March 19 and gave him "something for

his stomach."   Although LPNs are not licensed in Virginia to prescribe or order medications or

independently assess patients, this LPN decided to do so.  Notwithstanding Thrower's status as

suffering from the chronic condition of hypertension and his advanced age, in addition to his

unexplained, severe stomach pain and inability to sleep or pass bowels for many days, the LPN

did not alert a doctor.  She also did not document the encounter at all.

225.    The LPN then administered Thrower his blood pressure medicine on the morning of March 20, 2016, but either did not follow up with him at all or ignored that his symptoms had not gotten better despite her intervention.

226.    On March 20, 2016 at 2:41 p.m., medical records show that Thrower made yet another request for immediate medical care, this time electronically through the Regional Jail's kiosk system.  His request stated:

> I NEED TO SEE THE DOCTOR PLEASE.  I HAVE NOT HAD A BOWEL MOVEMENT IN FIVE DAYS I REALLY NEED SOMETHING SO I CAN PASS IT THROUGH.  MY STOMACH IS HURTING BECAUSE I HAVE NOT USED THE RESTROOM.  IM 68 YRS OLD AND IM HURTING.  PLEASE SEE ME ASAP. THANK YOU.

The request was never answered.  Records indicate that it was not even forwarded to CCS by Regional Jail personnel until about 10 hours after it was entered and after Thrower was deceased.

227.    Later that day, Thrower complained of chest pain to a correctional officer.  He also stated that he was not feeling well and had not had a bowel movement in five days.  Rather than call a Medical code to summon providers immediately, the correctional officer gave Thrower and another inmate helping him another paper grievance form to fill out.

228.    Thereafter, Thrower was discovered unresponsive while sitting on the toilet in his cell.  On autopsy, the medical examiner described "a severe acute pancreatitis with patchy necrosis, main pancreatic duct dilation, numerous gallstones in the gallbladder, [and] a gallstone in the duodenum...The etiology of the pancreatitis was a gallstone that had become impacted in the main pancreatic duct."

229.    Another inmate, **<u>Ronnie Lee Proffitt</u>**, died at the Regional Jail on April 27, 2016. According to *The Huffington Post*, Mr. Proffitt died of acute coronary insufficiency due to congestive heart failure.  Mr. Proffitt was reportedly arrested by Chesapeake police officers on

March 31, 2016 for a violation of probation and held in the Chesapeake City Jail until April 14,

2016; he was transferred to the Regional Jail on April 15, 2016, where he remained until his

death there on April 27, 2016.  Mr. Proffitt's Estate reportedly claimed to Regional Jail Authority

member City of Chesapeake and numerous other parties that Mr. Proffit's death was caused by

the Regional Jail's neglect of Mr. Proffitt's physical health and denial of required medication and

medical equipment for Mr. Proffitt's heart condition.

   230. Regional Jail inmate **Christopher Boyce** died in the custody of Hampton Roads

Regional Jail on March 23, 2016.  A seventh inmate, **Valerie Anderson**, died on May 26, 2016,

a day after she was transferred from the Regional Jail to a state mental hospital.

   231. On July 25, 2017, 56-year-old Regional Jail inmate **Frederick Mitchell** died.

According to the DOJ Report, CCS staff was aware that Frederick Mitchell (referred to as "GG"

in the Report) had a large mass in his liver.  Report P. 14. Medical records transferred from the

Norfolk Jail where he was originally held showed that the mass had been discovered on ultrasound in

June.  However, no biopsy was scheduled. *Id.*  GG instead spent the five weeks from his transfer to

the Regional Jail and his death in great pain, losing weight, becoming increasingly jaundiced,

suffering serious dehydration and having problems eating.  No diagnosis was made at the jail or

sought from outside providers as to what was causing Frederick Mitchell's condition. *Id.*  A nurse

noted that on July 16, Frederick Mitchell was vomiting, had an elevated and irregular heart rate and

complained of extreme pain.  The nurse wrote that she would call the physician on-call. But

Frederick Mitchell was not seen by a doctor until July 18, and that was for a routine, chronic care

visit. Id.   Still no biopsy was performed.  According to the Report, "Staff watched him deteriorate

without benefit of diagnosis or treatment." *Id.*  Frederick Mitchell reportedly died of liver cancer due

to hepatitis B and hepatitis C infection.

232.     Numerous inmate legal actions also reflect indifference to serious inmate medical needs going back to before and continuing through the additional deaths detailed above.  For example, former Regional Jail inmate **LaQuan Wright** filed a *pro se* federal action against multiple Regional Jail employees, as well as against multiple former Regional Jail healthcare providers alleging failures to provide him with appropriate medical care for his paraplegic condition, which caused serious medical conditions that were indifferently neglected.

a.     Wright alleges that he was not properly provided with catheters for voiding; he would be given single use catheters and expected to use them multiple times, an unsanitary practice that led to urinary tract and bladder infections.

b.     When he developed such infections, Wright alleges that he was denied care and medications for them.

c.     The Regional Jail also reportedly denied Wright, a paraplegic, a medical mattress needed to prevent the development of bed sores, and denied him even extra regular blankets and pillows.  According to Wright, he was put on "lock down" as a form of punishment for asking for a mattress to prevent the bed sores.

d.     Mr. Wright states that he developed bed sores, which were not properly treated; among other things, the wound vacuum used was not changed and cleaned properly.  Wright alleges that one bed sore was down to the bone.

e.     He also developed a staph infection from the growing, purulent bed sores, and was denied medication several times even as he was so ill that he was vomiting and could not hold down food.  Wright also contracted a more severe bone infection.

f.      Multiple outside facilities reportedly opined that Wright needed reconstructive surgery to repair the wounds caused by the bed sores, but such was not allowed by the Regional Jail.

g.      Wright claims that he made many complaints that were ignored and that most of his grievances were closed and not resolved. In conjunction with his suit, Wright filed 42 pages of grievances, including emergency grievances, that he filed with the Regional Jail, ranging in date from June 2014 to July 2015.

h.      Replies by Regional Jail medical and correctional officer personnel repeatedly dismiss Mr. Wright's concerns.  For example, a medial grievance stating, in part, "This is the second day in a row I haven't been given catheters causing me to urinate on myself..." is answered by a statement that "This submission does not meet the criteria for grievance...You will receive 4 catheters every other day" and closed; a response by Mr. Wright, "it clearly say [sic] on the back of the catheters single use only, you being a nurse should know that I will be at an even higher risk of infections..." is ignored.

i.      An emergency grievance stating, in part, "I've had my bedsore for over 6 months, I have been waiting patiently for a special kind of mat.  The mattress I'm sleeping on now caused my bedsore... Now when I lay it on my side, it wakes me up out of my sleep from so much pain to my side hip/back.  Breakdown started on my left hip now I'm laying on my right hip.  Soon breakdown will take place their [sic] too.  I can't lay flat on my back due to the huge bedsore on my butt. ..." is responded to by a non-medical Sergeant.  The Sergeant makes bureaucratic requests that appear to include nonsensically asking Mr. Wright where the Regional Jail should obtain proper medical equipment he has been requesting for some time, "Mr. Wright submit a paper request form so I can look further into your concerns.  As in who has this special

mattress." Mr. Wright states in his complaint that he also made many complaints to officials that were ignored, and his mother also called and made complaints. Mr. Wright says that "nothing was done" until his mother sent an email copying several organizations outside of the Regional Jail. According to Mr. Wright, he got a visit from officials the very next morning after the email was sent. Still, however, he was not given proper care- instead, he was transferred to another facility within a week of the email.[20]

233.    Inmate **Maurice Brown** filed a *pro se* federal action against the Hampton Roads Regional Jail in August 2015, the same month when Jamycheal Mitchell died there. In his complaint, Mr. Brown describes a tragically neglectful situation much like Mr. Wright's; Mr. Brown, who is also paralyzed, alleges that the Regional Jail allowed a painful bedsore to develop on his behind by failing to permit him proper medical equipment for his condition, including requiring him to "lay on hard surfaces" while a paraplegic. Although Mr. Brown was "in constant pain and discomfort" from the bedsore, the Regional Jail, he said, was not properly treating the bedsore and was actually allowing it to grow bigger over a period of several months. Mr. Brown alleged that the Regional Jail's actions threatened his life. He also alleged that the

---

[20] Plaintiff notes that Mr. Wright's matter has now been closed, following dismissal of multiple defendants either due to their not being served, or on motions to dismiss or motions for summary judgment. However, Plaintiff also notes that Mr. Wright was a disabled, still incarcerated *pro-se* plaintiff and did not appear to have opposed any of the motions filed against him by defense counsel, nor to have engaged in meaningful discovery or proper service efforts. Indeed, in July 2017, the Regional Jail publicly stated that it could not provide proper care to a man (Leonard Allen Morrison III) who was paralyzed in a gun battle with police and sent to the Regional Jail; the Regional Jail cited the inmate's need for assistance to use the bathroom as one of their concerns.

Regional Jail was doing nothing to prevent him from suffering another dangerous bedsore and had not responded properly to a grievance he filed concerning the bedsore.[21]

234.    Inmate Richard **Henry Byrd** filed a *pro se* federal complaint against a former superintendent, Hampton Roads Regional Jail, and medical contractor NaphCare in November 2014, concerning alleged denial of access to and provision of proper medical care for a serious medical need from September 7-September 10, 2014.  Mr. Byrd detailed in his complaint that he developed a tonsil infection that was not treated properly or timely, and resulted in his having to be rushed to the emergency room.  For four days in September 2014 prior to the emergency hospitalization, Mr. Byrd described that he repeatedly requested medical attention, but was not given proper care.

a.    In three different emergency grievances filed with his complaint, Mr. Byrd describes how he is coughing up blood and mucus, running a fever, experiencing "a great deal of pain," his mouth and throat are bloody and sore, he is vomiting, that he has not been able to eat anything for three days because he cannot swallow, and that he has been having trouble breathing; he begs for help, including through such pleas as, "I'm sincerely and humbly asking for some help. ...Please help me.  It's been three days... Please help me."

b.    All three of Mr. Byrd's grievances were "determined not to be emergencies." He explains in his complaint how a nurse who responded to his first grievance told him his throat was in fact swollen and he was having cold sweats due to a fever; however, she merely told Mr. Byrd that his illness was not an emergency, and did not treat him or give him any pain medication.  The nurse said she would put Mr. Byrd in for a doctor's visit, but, he was

---

[21]  Mr. Brown's action was later dismissed without prejudice due to failure to pay an initial partial filing fee; the final order was returned undeliverable to the Court.  Mr. Brown may have been transferred or released.

never seen.  Mr. Byrd informed correctional officers of his ailments, including that he could not

swallow food, had throat swelling and extreme pain and a tonsil infection, but that the officers

simply replied that "it was not their problem and to inform medical."

      c.     After a night of crying and pacing, unable to sleep due to the pain, and still

not being seen, Mr. Byrd filed a second emergency grievance; after waiting hours for a response,

he still was not seen.  Not only was his request deemed "not to be an emergency," but it was

needlessly not even processed; he was told to file yet another form, a request to the sick call

nurse.  Mr. Byrd explains that he did so, but he still was not seen by medical providers.

      d.     After another day went by, Mr. Byrd writes that he asked an officer to ask

a nurse to evaluate him while conducting her rounds on the unit.  The officer asked Mr. Byrd to

open his mouth so that he, a non-medical provider, could "see it for himself"; when Mr. Byrd

complied, but also cried due to the extreme pain, the officer laughed in his face and informed

him that "these tears will not get you to medical any faster."  The nurse declined to check Mr.

Byrd's severe throat condition, referencing her current task of pill call as the apparent reason she

could not help an inmate in acute distress.  Mr. Byrd states that the following day, he submitted a

third emergency grievance request.

      e.     After hours of additional pain and suffering without being given access to

medical care, he was finally called to Medical and seen by a nurse.  However, although the nurse

said upon examining Mr. Byrd that his "throat was so swollen that she was afraid to touch or

bother with it," her remedy was not to summon a doctor on call or EMS, but simply to put Mr.

Byrd on the list to be seen by the doctor the next day.  She gave him Motrin, and sent him back

to his cell.

f.      The next morning, Mr. Byrd says he "began to lose oxygen" and "couldn't breathe" because of further swelling.  His cell mate helped him bang on the cell door to get an officer's attention.  A sergeant was summoned, who took Mr. Byrd to Medical.  A nurse who looked at Mr. Byrd's throat immediately told him he needed to go to the emergency room.  Mr. Byrd was started on a IV and given a steroid shot to help him breathe, as well as pain medication.

g.      Mr. Byrd was taken to Maryview Hospital emergency room.  Mr. Byrd says he was given more pain medication, a CAT scan and additional medication to bring down the swelling because it was so bad that the doctor could not effectively examine him.  X-rays were later obtained after the swelling went down.  The doctor originally stated that Mr. Byrd would need to be transferred to another hospital to undergo surgery to remove the infection. However, it was later determined to release Mr. Byrd back to the Regional Jail with orders to closely monitor him and give him a potent antibiotic to loosen the infection and have it drain out, which was supposed to be less painful. Vicodin was also prescribed for pain.

h.      However, Mr. Byrd writes that when he was returned to the Regional Jail, the discharge orders were not followed.  The Regional Jail's doctor did not see Mr. Byrd until "days later" and then took him off of a liquid diet he was supposed to be on for 14 days, told him he would no longer receive anything for the pain, and told him his antibiotic medication would only last for four days.

i.      Mr. Byrd describes that he started writing "request reports" on the situation and asked his mother to call the Regional Jail; his mother informed him in a letter that she was hung up on when trying to intercede on his behalf.  The day he received his mother's letter, Mr. Byrd discovered that his phone privileges were terminated.  Mr. Byrd also alleges that

102

when he attempted to notify security about these incidents, he was told by Internal Affairs that if he proceeded with his complaints, he would have disciplinary actions brought against him.  Mr. Byrd alleges that he then sought copies of all request reports that had been made since his arrival at the Regional Jail; he was at first denied them, being told he would have to subpoena them through the courts, and then told he could receive them for $0.25/ copy, but his request to receive them was still unanswered.[22]

235.     Another inmate, **David Perry**, filed a complaint in federal court in October 2015. In his public complaint, Mr. Perry stated that he has HIV and hepatitis C.  Mr. Perry states that he was prescribed a medication for curing his Hepatitis C.  A gastroenterologist had also recently determined that Mr. Perry had "the most extensive case of h pylori [Helicobacter pylori (H. pylori) bacteria] in my stomach she ever came across," and had prescribed "2 strong antibiotics and a stomach pill."  The gastroenterologist gave orders that the infection needed to be cleared first, so that Mr. Perry could then be treated for the Hepatitis C.  Mr. Perry stated that his girlfriend and power of attorney had sent all of his prescriptions and medical records to the Regional Jail.  However, the Regional Jail was not providing Mr. Perry treatment for his H. pylori digestive tract infection, nor for his Hepatitis C.  Mr. Perry further writes in his complaint that he was "refused a 1983 form" (his complaint is written on paper in the form of a letter) and that he "has been threatened by staff here at HRRJ."  Mr. Perry also states that he "has asked to no avail for grievances and access to the law library to no avail."[23]

---

[22] Mr. Byrd's complaint was later dismissed without prejudice; a previous order responding to an *in forma pauperis* motion and requiring filing fee payment or a signed consent to collection of fees was returned non-deliverable to the Court, as was the Court's dismissal order. Mr. Byrd may have been moved in the system away from the Regional Jail or released.

[23] Mr. Perry's action was later dismissed without prejudice due to failure to return a consent to collection of fees form and *in forma pauperis* affidavit / failure to pay filing fee.  The

236.    On August 2, 2016, while Mr. Stewart was dying at the Regional Jail, a Regional

Jail inmate named **William Peacock** filed a federal court complaint against then Regional Jail

Superintendent David Simons.  Mr. Peacock made several disturbing allegations, including that

he "was unable to walk for days and medical treatment was denied" to him, that he was being

denied treatment for his Hepatitis C condition, and that the Regional Jail had failed to follow up

on a CT scan that reportedly indicated that he may have cancer.  Mr. Peacock alleged that he had

filed two emergency grievances on July 4, 2016 and one regular grievance and that they were

"disregarded," and that "nothing" was done when he appealed.  He also alleged that he "spoke

with pill pass nurse and security staff on numerous occasions."  As part of his requested relief,

Mr. Peacock asked for "transferal to a facility that will address my issues."[24]

237.    On August 4, 2016, while Mr. Stewart was dying at the Regional Jail, an inmate

named **Kennyon Harris** filed a federal complaint alleging lack of access to medical care at the

Regional Jail.  Mr. Harris alleged that he had diabetes and was not getting his diet needs met, and

was often being skipped for his diabetes checks, and that he "has been left to lay in an over

crowded cell in extream [sic] pain, unable to have a bowl [sic] movement for weeks at a time."

He alleged that when he filed a grievance, S. Taylor, RN "shows no concern at all, state I was

seen already!" and also wrote that he "complain[ed] to Sargent [sic] Whitehead who stated they

can't control Medical." Harris stated that "CCS Medical staff has failed to respond to the

emergency Grievance filed on 5-7-16 still to this day" and that he "has yet to see the doctor."

Mr. Harris alleged that "family members have called the Jail staff in regards to this matter" to no

court's final order was returned undeliverable to the court; Mr. Perry may have been transferred
out of the Regional Jail or released.
      [24]  Mr. Peacock's complaint was thereafter dismissed without prejudice after court
mailings to him were returned undeliverable. He may have been transferred or released.

avail, and he noted four "electronic request" numbers he had filed at the Regional Jail.  Harris wrote that "prison officials stated that they do not control medical and its [sic] out of there [sic] hands." He requested "preliminary injunctions" to be seen by outside medical doctors.[25]

238.    In September 2016, the *Richmond Times-Dispatch* reported that, according to its analysis of statistics from the Virginia Department of Corrections and the state Compensation Board, "[i]nmates died nearly nine times more often in custody at Hampton Roads Regional Jail than at other local or regional jails in Virginia during the past three years."  The paper elaborated that between June 2013 and September 2016, of the 6,716 inmates who have been incarcerated at the Regional Jail, 12 of them died, a rate of 178.7 per 100,000.  Per the *Times-Dispatch*, a total of 129 inmates had died statewide in Virginia during the same period, a rate of only 20.4 per 100,000. (Kleiner, Sarah and Evans, K. Burnell, "Hampton Roads Regional Jail is deadliest in the Virginia for inmates," *Richmond Times-Dispatch*, September 3, 2016).   Former Regional Jail Interim Superintendent Sheriff McCabe also released documentation in 2016 showing that between 2012 and 2016, 18 inmates had died at the Regional Jail.

239.    Seven Regional Jail inmates, including DJ, died in 2018.  This was more than those who died in 2015, when Jamycheal Mitchell died, or 2016, when Henry Stewart died. *Pilot*, April 11, 2019.

(The following counts are asserted cumulatively, or in the alternative, individually.)

---

[25]  Mr. Harris's complaint was later dismissed without prejudice to his right to resubmit the case due to failure to pay an initial partial filing fee or timely submit an objection to such.

X.      **COUNTS**

**COUNT I**

**State Law Claim – Wrongful Death** *(and, In the Alternative, Survival Claim)*

**NEGLIGENCE**

**(Against Defendants CCS; Moreno, MD; Barton, RN; Green, HSA; Determan, MHD; Shah, MD; Parker, Mental Health Professional; Hackworth; Bryant; Frey; Jordan; Kithcart; and the Regional Jail Authority)**

240.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiff asserts her survival claim *in the alternative* to Plaintiff's wrongful-death claim.

241.    Defendants CCS; Moreno, MD; Barton, RN; Green, HSA; Determan, MHD; Shah, MD; Parker, Mental Health Professional; Hackworth; Bryant; Frey; Jordan; Kithcart; and the Regional Jail Authority (collectively referred to *in this Count* as "the Foregoing Defendants"), had, among other duties, duties to exercise reasonable care with regard to DJ; however, the Foregoing Defendants breached these duties. The Foregoing Defendants had among other duties, duties to obtain or provide prompt medical care for DJ's acute and open and obvious condition.

242.    Defendants CCS; Moreno, MD; Barton, RN; Green, HSA; Determan, MHD; Shah, MD; and Parker, Mental Health Professional, owed duties to DJ to treat him in accordance with recognized and acceptable standards of medical care, health care, and/or nursing care and treatment; however, these Defendants breached the standard of care.

243.    As described throughout this Amended Complaint, the Foregoing Defendants breached duties owed to DJ, and these breaches constituted negligence.

106

244.     As a direct and proximate cause of the negligence of the Foregoing Defendants, which contributed to and was the proximate cause of the death herein complained of, DJ suffered great physical pain, injury, and mental anguish.

245.     As a direct and proximate result of the negligence of the Foregoing Defendants, DJ died.

246.     As a direct and proximate cause of the negligence of the Foregoing Defendants, which contributed to and was the proximate cause of DJ's injuries and death, the Statutory Beneficiaries have sustained damages, including, but not limited to:

     a)     Sorrow, mental anguish, and solace, which may include society, companionship, comfort, guidance, kindly offices, and advice of the decedent; and

     b)     Loss of services, protection, care, and assistance provided by the decedent.

247.     As a direct and proximate cause of the negligence of the Foregoing Defendants, which contributed to and were the proximate cause of DJ's injuries and death, the Estate of DJ sustained damages, including, but not limited to:

     a)     Expenses for the care and treatment of the decedent incidental to the injury resulting in death; and

     b)     Reasonable funeral expenses.

248.     The Foregoing Defendants' negligence establishes causes of action for monetary relief consisting of compensatory damages and costs to the Plaintiff.

## COUNT II

### State Law Claim – Wrongful Death *(and, In the Alternative, Survival Claim)*

### GROSS NEGLIGENCE

### (Against All Defendants)

249.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.  Plaintiff asserts her survival claim *in the alternative* to Plaintiff's wrongful-death claim.

250.     Defendants CCS; Moreno, MD; Barton, RN; Green, HSA; Determan, MHD; Shah, MD; Parker, Mental Health Professional; the Regional Jail Authority; Hackworth; Bryant; Frey; Jordan; Kithcart; and Baron (collectively referred to *in this Count* as "the Foregoing Defendants"), had, among other duties, duties to exercise reasonable care with regard to DJ; however, the Foregoing Defendants breached these duties.

251.     Defendants CCS; Moreno, MD; Barton, RN; Green, HSA; Determan, MHD; Shah, MD; and Parker, Mental Health Professional, also owed duties to DJ to treat him in accordance with recognized and acceptable standards of medical care, health care, and/or nursing care and treatment; however, these Defendants breached the standard of care.

252.     The Foregoing Defendants were grossly negligent in that their actions and inactions, described throughout this Amended Complaint, showed such a level of indifference to DJ so as to constitute an utter disregard of prudence, amounting to a complete neglect for DJ's safety. Additionally, the several acts of negligence of each of the Foregoing Defendants, when combined, had the cumulative effect of showing a reckless or total disregard for DJ.

253.     As a direct and proximate cause of the gross negligence of the Foregoing Defendants, which contributed to and was the proximate cause of the death herein complained of, DJ suffered great physical pain, injury, and mental anguish.

254.     As a direct and proximate result of the gross negligence of the Foregoing Defendants, DJ died.

255.     As a direct and proximate cause of the gross negligence of the Foregoing Defendants, which contributed to and was the proximate cause of DJ's injuries and death, the Statutory Beneficiaries have sustained damages, including, but not limited to:

    a)     Sorrow, mental anguish, and solace, which may include society, companionship, comfort, guidance, kindly offices, and advice of the decedent; and

    b)     Loss of services, protection, care, and assistance provided by the decedent.

256.     As a direct and proximate cause of the gross negligence of the Foregoing Defendants, which contributed to and was the proximate cause of DJ's injuries and death, the Estate of DJ sustained damages, including, but not limited to:

    a)     Expenses for the care and treatment of the decedent incidental to the injury resulting in death; and

    b)     Reasonable funeral expenses.

257.     The Foregoing Defendants' gross negligence establishes causes of action for monetary relief consisting of compensatory damages and costs to the Plaintiff.

## COUNT III

**State Law Claim – Wrongful Death *(and, In the Alternative, Survival Claim)***

**WILLFUL AND WANTON NEGLIGENCE**

**(Against Defendants CCS; Moreno, MD; Barton, RN; Green, HSA; Determan, MHD; Shah, MD; Parker, Mental Health Professional; the Regional Jail Authority; Hackworth; Bryant; Frey; Jordan; and Kithcart)**

258.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.  Plaintiff asserts her survival claim *in the alternative* to Plaintiff's wrongful-death claim.

259.    Defendants CCS; Moreno, MD; Barton, RN; Green, HSA; Determan, MHD; Shah, MD; Parker, Mental Health Professional; the Regional Jail Authority; Hackworth; Bryant; Frey; Jordan; and Kithcart (collectively referred to *in this Count* as "the Foregoing Defendants"), had, among other duties, duties to exercise reasonable care with regard to DJ; however, the Foregoing Defendants breached these duties.

260.    Defendants CCS; Moreno, MD; Barton, RN; Green, HSA; Determan, MHD; Shah, MD; and Parker, Mental Health Professional, also owed duties to DJ to treat him in accordance with recognized and acceptable standards of medical care, health care, and/or nursing care and treatment; however, these Defendants breached the standard of care.

261.    The Foregoing Defendants were willfully and wantonly negligent in that they acted, or failed to act, in the manner described throughout this Amended Complaint, consciously in disregard of DJ's rights.  In addition, the Foregoing Defendants acted, or failed to act, in the manner described throughout this Amended Complaint, with a reckless indifference to the consequences to DJ when they were aware of their conduct and also aware, from their knowledge of existing circumstances and conditions, that their conduct would result in injury to DJ.

110

262.    As a direct and proximate cause of the willful and wanton negligence of the Foregoing Defendants, which contributed to and was the proximate cause of the death herein complained of, DJ suffered great physical pain, injury, and mental anguish.

263.    As a direct and proximate result of the willful and wanton negligence of the Foregoing Defendants, DJ died.

264.    As a direct and proximate cause of the willful and wanton negligence of the Foregoing Defendants, which contributed to and was the proximate cause of DJ's injuries and death, the Statutory Beneficiaries have sustained damages, including, but not limited to:

        a)    Sorrow, mental anguish, and solace, which may include society, companionship, comfort, guidance, kindly offices, and advice of the decedent; and

        b)    Loss of services, protection, care, and assistance provided by the decedent.

265.    As a direct and proximate cause of the willful and wanton negligence of the Foregoing Defendants, which contributed to and was the proximate cause of DJ's injuries and death, the Estate of DJ sustained damages, including, but not limited to:

        a)    Expenses for the care and treatment of the decedent incidental to the injury resulting in death; and

        b)    Reasonable funeral expenses.

266.    The Foregoing Defendants' willful and wanton negligence establishes causes of action for monetary relief consisting of compensatory damages and costs to the Plaintiff.

267.    Also, the foregoing willful and wanton negligence claim supports, and Plaintiff seeks, the imposition of significant punitive damages.

## COUNT IV

### DEPRIVATION OF CIVIL RIGHTS – 42 U.S.C. § 1983
### (DENIAL, DELAY, AND WITHHOLDING OF MEDICAL CARE)

**(Against Defendants Moreno, MD; Barton, RN; Green, HSA; Determan, MHD; Shah, MD; Parker, Mental Health Professional; Hackworth; Bryant; Frey; Jordan; and Kithcart)**

268.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

269.     At all times relevant to the allegations in this Amended Complaint, Defendants Moreno, MD; Barton, RN; Green, HSA; Determan, MHD; Shah, MD; Parker, Mental Health Professional; Hackworth; Bryant; Frey; Jordan; and Kithcart (collectively referred to *in this Count* as "the Foregoing Defendants"), acted or failed to act under color of state law.

270.     The Fourteenth Amendment to the U.S. Constitution provides to pretrial detainees the right to receive treatment for serious medical needs.

271.     As described in the Amended Complaint, the Foregoing Defendants failed to provide necessary medical care, and/or access to necessary medical care, in response to obvious, serious medical needs.

272.     The Foregoing Defendants engaged in this injurious conduct with deliberate indifference to DJ's health and safety, thereby placing DJ in substantial risk of serious harm.

273.     At numerous times throughout the course of his detention, the Foregoing Defendants learned that there was a substantial risk that DJ had serious medical needs that were not being met.  Despite such knowledge, the Foregoing Defendants failed to reasonably respond.

274.     The acts or omissions of the Foregoing Defendants were conducted within the scope of their official duties and employment.

112

275.    As a direct and proximate result of the Foregoing Defendants' conduct, DJ was injured in various respects, including, without limitation, suffering physical injuries and severe mental anguish due to the egregious nature of the Foregoing Defendants' actions, all attributable to the deprivation of his constitutional rights guaranteed by the Fourteenth Amendment to the U.S. Constitution and protected under 42 U.S.C. §1983.

276.    As a direct and proximate result of the Foregoing Defendants' conduct, DJ died. DJ's death constitutes a deprivation of his constitutional rights guaranteed by the Fourteenth Amendment to the U.S. Constitution and protected under 42 U.S.C. §1983.

277.    The Foregoing Defendants' aforesaid actions and omissions constitute a willful, wanton, reckless, and conscious disregard of DJ's rights, by reason of which Plaintiff is entitled to recover punitive damages.

278.    The Foregoing Defendants' violations of the Fourteenth Amendment to the U.S. Constitution establish a cause of action, pursuant to 42 U.S.C. § 1983, for monetary relief consisting of compensatory damages and punitive damages, attorney's fees and costs to the Estate.

## COUNT V

**DEPRIVATION OF CIVIL RIGHTS – 42 U.S.C. § 1983
(DELIBERATE INDIFFERENCE - SUPERVISORY LIABILITY)**

**(Against Defendants Moreno, MD; Barton, RN;
Green, HSA; Determan, MHD; Hackworth; and Bryant)**

279.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

280.    Through their actions and omissions set forth above, and while acting under color of state law, and in their individual capacities, Defendants Moreno, MD; Barton, RN; Green,

113

HSA; Determan, MHD; Hackworth; and Bryant (collectively referred to *in this Count* as "the Foregoing Defendants"), acted in a manner that was deliberately indifferent to DJ's Fourteenth Amendment rights.

281.    The Foregoing Defendants had actual knowledge that their subordinates, including, but not limited to, individual Defendants in this matter, were engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like DJ.

a.    As noted above, among other things, through their duties according to the Regional Jail's policies and procedures; the removal by ICE of its inmates from the Regional Jail; the multiple other deaths from preventable conditions that had occurred at the Regional Jail; the multiple state investigations and federal investigation following the deaths of Jamycheal Mitchell and Henry Stewart; the plethora of other complaints describing severe medical conditions that were being ignored at the Regional Jail concerning other inmates before DJ's death; warnings from former Superintendent Myers and the Department of Justice concerning dangerous insufficient staffing levels; receipt of medical contractor reports per the Regional Jail policy and contract; and role in reviewing and approving medical contractor policies and procedures regarding inmate requests for medical treatment, Defendants Hackworth and Bryant certainly knew that their subordinates were preventing inmates like DJ with serious medical conditions from having access to and receiving proper medical care.

b.    As noted above, Defendants Moreno, MD; Barton, RN; Green, HSA; and Determan, MHD, through, among other things as described herein, their daily meetings, Continuous Quality Improvement participation, reports to the Regional Jail administration, knowledge of the Department of Justice investigation and the failings in medical and mental health services and staff that it was continuing to expose, and the multiple preventable deaths

occurring during CCS's tenure at the Regional Jail, also knew that, just like they themselves, their subordinates were preventing inmates like DJ with serious medical conditions from having access to and receiving proper medical care.

282. The Foregoing Defendants' response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices. Time and time again, the Foregoing Defendants failed to act on their knowledge, failed to carry out *their own obligations* to properly to supervise their subordinates and/or intervene on DJ's behalf, and failed to provide DJ with access to appropriate, timely medical care; instead, they let him languish and die.

283. There was an affirmative causal link between the Foregoing Defendants' inaction and the particular constitutional injury suffered by DJ. Specifically, as a result of the Foregoing Defendants' unconstitutional, deliberate indifference to the needs, circumstances, and requirements regarding Virginia inmates and detainees, including to DJ's non-receipt of antipsychotic and diabetes medications, DJ unnecessarily languished without appropriate medical intervention, and ultimately died a preventable death. DJ thereby suffered a denial of his constitutional rights and severe physical pain and suffering. The Foregoing Defendants' unconstitutional, deliberate indifference to DJ's circumstances caused his untimely death.

284. The Foregoing Defendants' aforesaid actions and omissions constitute a willful, wanton, reckless, and conscious disregard of DJ's constitutional rights, by reason of which Plaintiff is entitled to recover punitive damages.

285. The Foregoing Defendants' violations of the Fourteenth Amendment to the U.S. Constitution establish a cause of action, pursuant to 42 U.S.C. § 1983, for monetary relief

consisting of compensatory damages and punitive damages, attorney's fees and costs to the Estate.

**COUNT VI**

**§ 1983 CLAIM**
**(OFFICIAL CUSTOM, POLICY, PATTERN AND/OR PRACTICE CLAIM)**

**(Against Defendants Regional Jail Authority; CCS; and, in their official capacities, Hackworth; Moreno, MD; Barton, RN; Green, HSA; and Determan, MHD)**

286.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

287.    This Count is brought against: 1) Defendant Regional Jail Authority, and its policy makers – either the Authority itself or Defendant Hackworth (in his official capacity), and 2) Defendant CCS and its policy makers in their official capacities – Moreno, MD; Barton, RN; Green, HSA; or Determan, MHD, pursuant to the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983 and § 1988.

288.    During the relevant time period, through their actions and inactions as set forth above, Defendants Regional Jail Authority and CCS, acting under color of state law, pursuant to an official custom, policy, pattern and/or practice, operated the Regional Jail and/or the provision of healthcare services at the Regional Jail in a manner that posed a substantial risk to the health and safety of the inmates/detainees, including DJ, in that the Regional Jail Authority and CCS failed to provide, and/or provide access to, reasonable and adequate medical care to inmates and detainees.

289.    As set forth in detail herein, the policy or custom was manifest in certain affirmative decisions and omissions by the policy makers for the Regional Jail Authority and CCS alleged in Counts IV and V, as well as by a persistent and widespread practice of deliberate

indifference to the health care needs of the inmates/detainees sufficient to constitute an official custom. The custom, policy, pattern and/or practice is established by, among other acts, Defendants Regional Jail Authority and CCS's failure to act—whether through appropriate training, discipline, supervision or other intervention—in the face of a known pattern of constitutional deprivations that had occurred within the Regional Jail.  Such failure was patently likely to cause (and in the case of DJ, did cause) constitutional deprivations to the inmates/detainees who were confined in the Regional Jail, and to whom the Regional Jail Authority and CCS owed affirmative duties of care.

290.  Defendants Regional Jail Authority or Hackworth (policy makers for the Regional Jail Authority), and Defendants Moreno, MD; Barton, RN; Green, HSA; or Determan, MHD (policymakers for CCS), and any other policy makers for the Regional Jail Authority and CCS (collectively referred to in this Count as "Policy Makers"), were deliberately indifferent to the rights of inmates/detainees to receive, and/or obtain access to, adequate medical care at the Regional Jail.  Such deliberate indifference is evidenced by, among other things, as discussed herein:

- the large number of deaths at the Regional Jail from 2015 to just before DJ's death in May 2018, including after CCS's involvement at the Regional Jail began in December 2015.  Alton Cowins, Jamycheal Mitchell, Mark Goodrum, William Thrower, Christopher Boyce, Ronnie Lee Profitt, Henry Clay Stewart, and Frederick Mitchell all lost their lives while incarcerated at the Regional Jail, and Valerie Anderson died one day after transfer from the Regional Jail.  Thereafter, multiple more inmates died in 2018, the year of DJ's death;

117

- public records reflecting that inmates died nearly **nine times more** often in custody at the Regional Jail than at other local or regional jails in Virginia during the period from June 2013 to early September 2016 (with 12 total deaths during that expanded period), and records released by the Regional Jail indicating 18 deaths in the period from 2012 to September 2016;

- the tragic circumstances surrounding the deaths of mentally ill inmates Jamycheal Mitchell and Alton Cowins;

- the tragic circumstances surrounding the death of the Regional Jail inmate Mr. Stewart in August 2016, who submitted multiple grievances asking for help prior to his death;

- the tragic neglect surrounding the death of Mr. Thrower in March 2016, including how his multiple emergency grievances detailing serious medical needs (experiencing sharp pains, was unable to sleep *for multiple days*, unable to defecate, "Please help me," "I am in real bad pain!") were simply rebuffed and deemed not to be emergencies, including the day before his death, and how his chest pain on his date of death was met by an officer response to fill out another grievance;

- the wrongful death of Mr. Proffitt in April 2016, who reportedly died after being denied required medication and medical equipment for his heart condition, and, further, simply having his compromised health condition neglected;

- the multiple grievances filed by other inmates, including LaQuan Wright, Richard Henry Byrd, David Perry, Maurice Brown, Carlton Dillard, William Peacock and Kennyon Harris, who, fortunately, did not die at the Regional Jail, but suffered considerable wrongful denials of proper medical care and access to medical care-

118

including situations as atrocious as Carlton Dillard, an inmate who filed 9 different emergency grievances in one month that were all rejected,  being consigned to throw up and urinate blood on a daily basis and be routinely denied medication and other treatment, and Kennyon Harris inexplicably having diabetes checks routinely skipped, being denied access to a doctor despite continued pain and inability to have bowel movements for weeks, being rejected by a nurse because he had "already been seen" and being rebuffed by a Regional Jail sergeant he turned to for help after his grievance was rejected;

- the common themes underlying the stories of the foregoing persons who suffered significant injury or death at the Regional Jail, including that obvious signs of medical distress were ignored;

- the multiple investigations of the Regional Jail by Virginia state agencies, including the finding that "a change in provider offers limited promise of improvement in care or documentation in the absence of a change in **oversight practices.**" (Emphasis added);

- the federal investigation by the U.S. Department of Justice, which was ongoing and exposing, by extensive interviews and records review at the jail, multiple constitutional flaws; and

- recent warnings from DOJ and a previous superintendent that staffing at the Regional Jail was inadequate.

Despite having actual knowledge of the foregoing, the Policy Makers did not take appropriate steps to properly train correctional officers and CCS employees.  As a direct and proximate result of Policy Makers' failures, DJ suffered constitutional injuries, including death.

291.    Defendants Regional Jail Authority and CCS, themselves, had knowledge of the constitutionally inadequate medical services and access to medical services available to inmates/detainees at the Regional Jail, and engaged in an official custom, policy, pattern and/or practice of deliberate indifference towards the inmates/detainees at the Regional Jail, in the period prior to, and at the time of, DJ's death.  Specifically, the Policy Makers perpetuated a medical and mental healthcare system that for years failed to provide adequate intake, discharge planning, sick call, chronic care, and emergency care such that prisoners were subjected to an unacceptable risk of harm due to delays or lack of treatment; suffered from systemic problems that *often* caused the failure to provide an adequate level of care, including proper medication administration; provided inadequate mental health treatment services, including inadequate medication management; and did not have enough mental health professionals.  With regard to the Regional Jail Authority's policy makers, they also perpetuated a correctional system that did not have adequate correctional staff (and knowingly had not for years) and was not properly funded, despite being required to take the sickest inmates from its member cities as fast as possible.  The Policy Makers propagated a culture of neglect and indifference to inmate serious medical needs that allowed unnecessary injuries and deaths to occur; among other things, correctional officers washed their hands of their duties to adequately monitor inmates or provide them access to medical care for serious medical needs, and medical providers utterly failed to communicate and coordinate care properly among themselves and provide inmates/detainees with critically needed care.

292.    This official custom, policy, pattern and/or practice reflected a deliberate indifference to, and has resulted in a deprivation of, DJ's constitutional rights under the Fourteenth Amendment and/or other statutory rights, and, such custom, policy, pattern and/or

practice has caused, or has contributed to cause, DJ's death.  As stated herein, Defendants

Regional Jail Authority and CCS's policies and customs were directly related to, and the moving

force behind, the violation of DJ's constitutional rights by, among other acts, those of Policy

Makers and their employees and agents.  As a result, DJ suffered a denial of his constitutional

rights, physical pain, and untimely death.  Defendants' unconstitutional, deliberate indifference

to DJ caused his untimely death.

293.    WHEREFORE, Defendants' violations of the Fourteenth Amendment to the

United States Constitution establish causes of action, pursuant to 42 U.S.C. § 1983, for monetary

relief consisting of compensatory damages in an amount to be established at trial, and attorney's

fees and costs to the Estate.

## XI.    <u>JURY TRIAL DEMANDED</u>

294.    Plaintiff demands that all issues of fact of this case be tried to a properly

impaneled jury to the extent permitted under the law.

## XII.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor

and against each of the Defendants, specifically, Defendants CCS (as defined above); Dale

Moreno, MD; Krasinda S. Barton, RN; April D. Green, HSA; Sarah Determan, MHD; Amit R.

Shah, MD; LeRoyal T. Parker, Mental Health Professional; Hampton Roads Regional Jail

Authority; David A. Hackworth; Linda K. Bryant; Frey; Jordan; Kithcart; and Joseph P. Baron,

jointly and severally,  in  the  amount  of  $ 15 million ($15,000,000.00), or in such greater amount

to be determined at trial, costs, pre-judgment and post-judgment interest,  attorney's fees (in

connection with the federal civil rights claims), punitive damages in the amount of $3.5 million

($3,500,000.00) for the federal claims asserted herein and $350,000.00 in connection with the

state claims asserted herein, and grant such other and further relief that the Court may deem

appropriate.

MARCIA A. KEELING, ADMINISTRATOR OF
THE ESTATE OF DAVAGEAH K. JONES,
DECEASED


By: _____/s/ Mark J. Krudys_____
                    Counsel

Mark J. Krudys (VSB# 30718)
THE KRUDYS LAW FIRM, PLC
SunTrust Center
919 East Main Street, Suite 2020
Richmond, Virginia 23219
804.774.7950 Phone
804.381.4458 Fax
mkrudys@krudys.com

Michael Goodove (VSB# 34563)
Elizabeth Kalocay Ufkes (VSB# 70149)
SWARTZ TALIAFERRO SWARTZ & GOODOVE
220 West Freemason Street
Norfolk, Virginia 23510
757.275.5000 Phone
757.626.1003 Fax
mike@goodove.com
beth@stsg-law.com

*Counsel for Plaintiff Marcia A. Keeling, Administrator of the Estate of Davageah K. Jones,
Deceased*